**United States District Court**
For the Northern District of California

1

2

3

4

5

6                        IN THE UNITED STATES DISTRICT COURT

7                       FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9     KINETIC SYSTEMS, INC.,            )  Case No. 12-1619-SC
                                        )
10              Plaintiff,              )  ORDER DENYING PLAINTIFF'S
                                        )  MOTION TO REMAND AND
11       v.                             )  DENYING DEFENDANT'S MOTION
                                        )  <u>TO DISMISS</u>
12    FEDERAL FINANCING BANK and DOES 1 )
      through 25,                       )
13                                      )
                                        )
14              Defendants.             )
                                        )
15    _____

16    I.    <u>INTRODUCTION</u>

17          This lawsuit stems from the closure of Solyndra, a Fremont,

18    California-based maker of solar panel technology.  In September

19    2009, the U.S. Department of Energy ("DOE"), Solyndra, and

20    Defendant Federal Financing Bank ("FFB") entered into a series of

21    agreements by which FFB, at the behest of DOE, purchased from

22    Solyndra a promissory note in the amount of $535 million.  DOE

23    guaranteed the note.  Solyndra used these funds to begin

24    construction on a manufacturing facility (the "Project"), but, in

25    August 2011, before the facility opened, Solyndra abruptly closed.

26          Plaintiff Kinetic Systems, Inc. ("Plaintiff") is a California

27    contractor.  Plaintiff alleges that it performed $2.870 million

28    worth of work on the Project and is still owed roughly $1.187

**United States District Court**
For the Northern District of California

million.  After Solyndra closed, Plaintiff served a bonded stop notice on FFB -- that is, it claimed a right to be paid out of excess construction funds allegedly held by FFB.  When FFB did not pay, Plaintiff sued FFB in California state court for enforcement of the bonded stop notice, whereupon FFB removed to this Court.

Two motions are now pending, both fully briefed and suitable for decision without oral argument.  The first motion, filed by Plaintiff, asks the Court to remand this action to state court. ECF Nos. 10 ("MTR"), 30 ("MTR Opp'n"), 31 ("MTR Reply").  The second motion, filed by FFB, asks the Court to dismiss the case under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction, or, in the alternative, to enter summary judgment in favor of FFB.  ECF Nos. 6 ("MTD"), 19 ("MTD Opp'n"), 28 ("MTD Reply").  FFB has moved for dismissal under Rule 12(b)(1) because it asserts the defenses of sovereign immunity and conflict preemption, which are jurisdictional in nature.  As for the summary judgment portion of its motion, FFB argues that it is not a "construction lender," as California law defines that term.  The question of whether California's stop-notice laws reach FFB appears to be one of first impression, as neither party has cited any case directly addressing the point, nor is the Court aware of any.

For the reasons set forth below, the Court DENIES Plaintiff's motion to remand because FFB has a "colorable federal defense," Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1251 (9th Cir. 2006), namely, the federal defenses raised in its Rule 12(b)(1) motion.  The Court, however, DENIES FFB's Rule 12(b)(1) motion: Though FFB's jurisdictional defenses are "colorable" for purposes of removal, they are not meritorious.  The Court also denies FFB's

**United States District Court**
For the Northern District of California

1  request for summary judgment because FFB has not shown that it

2  falls outside California's definition of a "construction lender."

3

4  **II.   BACKGROUND**

5      Understanding this dispute requires an understanding of: the

6  nature of FFB; the framework of the program by which FFB provided

7  financing guaranteed by DOE; and the details of the particular

8  arrangement between Solyndra, DOE, and FFB.   The Court reviews

9  those topics before recounting the events that led Plaintiff to

10  issue a bonded stop notice to FFB and hence to this lawsuit.

11      **A.   FFB**

12      Nearly forty years ago, Congress created FFB by passing the

13  Federal Financing Bank Act of 1973, Pub. L. No. 93-224, 87 Stat.

14  937 (1973) ("FFB Act"), codified at 12 U.S.C. § 2281 et seq.

15  Congress found that "demands for funds through Federal and

16  federally assisted borrowing programs [were] increasing faster than

17  the total supply of credit and that such borrowings [were] not

18  adequately coordinated with overall Federal fiscal and debt

19  management policies."  12 U.S.C. § 2281.   Federal agencies

20  administering increasingly popular loan-guarantee programs were

21  using private lenders to furnish the loans, which had the

22  unintended effect of increasing costs to the federal government and

23  disrupting private finance markets.   See generally Willis-Proctor

24  Decl. Ex. 6 ("McNamar Report") at 8-10, 12-17.[1]   The purpose of the

25  _____

26  [1] In support of its motion to dismiss, FFB submitted the
   declaration of Cherisse Willis-Proctor, a records officer within
   the U.S. Department of Treasury who has supplied as exhibits
27  certified copies of various agreements relevant to the case.  ECF
   No. 7 ("Willis-Proctor Decl.").   Exhibit 6 contains a statement
28  made to the House Ways and Means Committee on May 12, 1983 by
   Deputy Secretary of the Treasury R.T. McNamar, in which Deputy

3

FFB Act was "to assure coordination of these programs with the overall economic and fiscal policies of the Government, to reduce the cost of Federal and federally assisted borrowings from the public, and to assure that such borrowings are financed in a manner least disruptive of private financial markets and institutions." 12 U.S.C. § 2281.[2]  Congress established FFB as a "body corporate . . . subject to the general supervision and direction of the Secretary of the Treasury" and made it "an instrumentality of the United States Government."  12 U.S.C. § 2283.

Congress conferred on FFB a number of general powers.  Id. § 2289.  One of these is the power "to sue and be sued, complain, and defend, in its corporate name."  Id. § 2289(1).  Another is the power "to enter into contracts, to execute instruments to incur liabilities, and to do all things as are necessary or incidental to the proper management of its affairs and the proper conduct of its business."  Id. § 2289(9).  One of the functions of FFB is to purchase or sell any obligation issued, sold, or guaranteed by a federal agency.  Id. § 2285(a).  "Obligation" is a defined term that includes "any note, bond, debenture, or other evidence of indebtedness," with certain exceptions not relevant here.  Id. § 2282(2).  FFB often exercises its power to purchase obligations in order to serve as a lender for programs wherein a federal agency (for example, DOE) guarantees a loan to a private entity (for

Secretary McNamar explained, among other things, the background and purposes of FFB.

[2] See also Pealo v. Farmers Home Admin., 412 F. Supp. 561, 563 (D.D.C. 1976) rev'd 562 F.2d 744 (D.C. Cir. 1977) (Congress established FFB "to provide a source of funds for Federal agencies so as to lessen competition among the agencies in the private money market and to provide lower interest cost to the United States.").

United States District Court
For the Northern District of California

1   example, a builder of electrical infrastructure).  Generally, FFB

2   provides the financing by purchasing a note which the federal

3   agency then guarantees.[3]

4       **B.   The Solyndra Financing Arrangement**

5       The Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat.

6   594 (2005) ("Energy Policy Act"), codified at 42 U.S.C. § 16511 <u>et</u>

7   <u>seq.</u>, authorizes the Secretary of Energy ("Secretary") to guarantee

8   loans for certain eligible projects, and appropriates funds to

9   cover the costs of such guarantees.  <u>See</u> 42 U.S.C. §§ 16511-14.

10  When the Secretary guarantees 100 percent of a loan, the loan must

11  be funded by FFB (as opposed to a private bank).  <u>See</u> 10 C.F.R. §

12  609.10(d)(4)(i).

13      In September 2009, FFB and the Secretary entered into a

14  Program Financing Agreement that supplies the general framework for

15  this financing program.  <u>See</u> Willis-Proctor Decl. Ex. 1 ("PFA").

16  The financing process begins when the Secretary designates a

17  borrower.  <u>See</u> <u>id.</u> § 2.1.  The Secretary's formal designation of a

18  borrower places the Secretary and FFB under three separate

19  commitments: (a) FFB and the Secretary must sign "a Note Purchase

20  Agreement with the particular Borrower . . . setting forth the

21  terms and conditions under which FFB will purchase a Note issued by

22  such Borrower"; (b) the Secretary must guarantee the note pursuant

23  to the Energy Policy Act; and (c) FFB must purchase the note

24

25  [3] <u>E.g.</u>, <u>Californians for Renewable Energy v. U.S. Dept. of Energy</u>,
    CIV.A. 11-2128 JEB, 2012 WL 1744468, at *1 (D.D.C. May 17, 2012);
26  <u>U.S. ex rel. Raynor v. Nat'l Rural Utils. Co-op Fin. Corp.</u>,
    8:08CV48, 2011 WL 976482, at *2 (D. Neb. Mar. 15, 2011); <u>Great</u>
    <u>Plains Gasification Assocs. v. C.I.R.</u>, 92 T.C.M. (CCH) 534 (T.C.
27  2006); <u>Brazos Elec. Power Co-op, Inc. v. United States</u>, 49 Fed. Cl.
    398, 400 (Fed. Cl. 2001); <u>Resolution Trust Corp. v. California</u>, 851
28  F. Supp. 1453, 1455 n.1 (C.D. Cal. 1994); <u>Mason Cnty. Med. Ass'n v.</u>
    <u>Knebel</u>, 563 F.2d 256, 260 (6th Cir. 1977).

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1   pursuant to the FFB Act.  Id. § 2.3.  Note Purchase Agreements

2   signed by FFB and designated borrowers require the borrower to

3   offer a promissory note to FFB, which FFB then buys, assuming

4   certain preconditions are satisfied.  Id. §§ 1.1, 4.1.  One of

5   those preconditions is the receipt by FFB of the Secretary's

6   guarantee of the note in the event that a borrower defaults.

7       The PFA provides that the note shall be a future advance

8   promissory note.  Id. § 1.1 (definition of "Note").  The amount of

9   the note represents the maximum amount of financing that a borrower

10  may receive under their particular PFA.  Form NPA § 7.3.4.[4]  The

11  borrower receives the financing by requesting an advance on the

12  note.  Id. § 7.2.  The borrower usually must specify a third party

13  to receive the advance; in other words, FFB gives money to the

14  borrower's creditors, not to the borrower itself.  Id. § 7.2(b).[5]

15  The Secretary must approve each request before FFB will disburse

16  the advanced funds.  Id. § 7.2(a).  Advances may be made "only at

17  such time and in such amount as shall be necessary to meet the

18  immediate payment or disbursing need of the Borrower."  Id.

19      On September 2, 2009, Solyndra, DOE, and FFB entered into a

20  Note Purchase Agreement.  Willis-Proctor Decl. Ex. 2 ("Solyndra

21  NPA").  Under the terms of the Solyndra NPA, Solyndra agreed to

22  offer FFB a note in the amount of $535 million.  The Secretary

23  guaranteed the note and FFB purchased it.  The terms of the

24

25  [4] The Willis-Proctor Declaration has several exhibits, the first of
    which is the PFA; the PFA, in turn, has several Annexes consisting
26  of form examples of documents required by the PFA.  Annex 3 to the
    PFA is a form Note Purchase Agreement ("Form NPA").

27  [5] The PFA makes an exception for "[a]dvances to reimburse the
28  Borrower for expenditures that it has made from its own working
    capital."  Form NPA § 7.2(b).

**United States District Court**
For the Northern District of California

1   Solyndra NPA tracked the general terms set forth above.  That is,

2   the Secretary guaranteed a $535 million note offered by Solyndra

3   and purchased by FFB, against which note Solyndra could request

4   advances of funds which, if approved by the Secretary, FFB would

5   pay directly to Solyndra's creditors according to its "immediate

6   payment or disbursing needs[s]," up to an aggregate maximum of $535

7   million and repayable with interest.

8        **C.   Plaintiff's Stop Notice**

9        The Court takes this portion of its account from the

10  allegations in Plaintiff's state court complaint and FFB's notice

11  of removal.  ECF No. 1 (notice of removal ("NOR")) Ex. A

12  ("Compl.").  Plaintiff is a California corporation and duly

13  licensed contractor.  Compl. ¶ 1.  Plaintiff alleges that FFB acted

14  as a "construction lender" to Solyndra with regard to construction

15  of Solyndra's manufacturing facility at 47488 Kato Road, Fremont,

16  California.  Id. ¶ 8.  Plaintiff "furnished labor, services,

17  equipment and material for the installation of mechanical piping

18  and components (HVAC, plumbing, process) for tool hookup . . .

19  pursuant to written contract with Solyndra." Id. ¶ 9.  Before its

20  closure, Solyndra issued purchase orders to Plaintiff for work

21  valued at $2,967,762.  Id.  Plaintiff allegedly completed

22  $2,870,372 worth of work on those orders.  Id.  Plaintiff received

23  partial payment on those purchase orders in the amount of

24  $1,682,422, leaving an unpaid balance of $1,187,950, plus interest.

25  Id. ¶ 10.  Solyndra suspended operations on August 31, 2011, while

26  work on the Project was still ongoing.  Id. ¶ 11.  In January 2012,

27

28

United States District Court
For the Northern District of California

1    Plaintiff served FFB with a bonded stop notice.[6]  Id., id. Ex. A

2    ("Stop Not.").  FFB refused to set aside funds to satisfy the stop

3    notice.  Id. ¶ 17.

4         On or around February 28, 2012, Plaintiff sued FFB in Alameda

5    County Superior Court for enforcement of the bonded stop notice.

6    Compl. at 1 (state court case number RG12618947).  On March 13, the

7    United States Attorney's Office received copies of the state court

8    summons and complaint from the U.S. Department of Treasury.  NOR ¶

9    4.  On April 2, FFB removed the case from state court to this

10   Court, citing, inter alia, the federal-agency removal statute, 28

11   U.S.C. § 1442.[7]  NOR ¶ 5.  On April 23, FFB moved to dismiss the

12   [6] A stop notice is "a notice by one who has furnished materials or
     labor for the construction of improvements, given to the owner of
13   the property, or to a lender of funds to be used for payment of
     claims against such property, for the purpose of withholding money
14   in the hands of such owner or lender from the contractor so that
     the materialman or laborer may be paid for his material or
15   services."  See Flintkote Co. v. Presley of N. California, 154 Cal.
     App. 3d 458, 462 (Cal. Ct. App. 1984) (citing Theisen v. Cnty. of
16   Los Angeles, 54 Cal. 2d 170, 177-179 (Cal. 1960)); see also Miller
     & Starr, 10 Cal. Real Est. § 28:78 (3d ed.) ("Miller & Starr").  A
17   bonded stop notice is a stop notice supported by a bond of 125
     percent of the amount of the claim contained in the stop notice.
18   Miller & Starr, supra, § 28:84.  Generally, compliance with a
     bonded stop notice is mandatory, while compliance with a non-bonded
19   stop notice is permissive.  Manos v. Degen, 203 Cal. App. 3d 1237,
     1240 (Cal. Ct. App. 1988) (citing Cal. Civ. Code § 3162, repealed
20   by Stats. 2010, c. 697 (S.B. 189) § 16, operative July 1, 2012));
     see also Cal. Civ. Code § 8536(b) (covering former § 3162).
21   Certain revisions to California's stop-notice laws took effect on
     July 1, 2012, during the pendency of this motion.  The revisions
22   mainly restyled and renumbered the applicable sections of the
     California Civil Code, and do not substantively change the law
23   applicable to this case.  See 44 Cal. Jur. 3d § 69 (section on
     mechanics' liens and stop notices setting forth definitions which
24   apply under either pre- or post-revision code).
     [7]    A civil action . . . that is commenced in a State court
25        and that is against or directed to any of the following
          may be removed by them to the district court of the
26        United States for the district and division embracing the
          place wherein it is pending: [¶] The United States or any
27        agency thereof or any officer (or any person acting under
          that officer) of the United States or of any agency
28        thereof, in an official or individual capacity, for or

8

United States District Court
For the Northern District of California

case and, on May 2, Plaintiff moved to remand the case back to state court.  FFB's motion to dismiss argues that Plaintiff's claim must fail for three reasons: (1) it is barred by the doctrine of sovereign immunity, (2) it conflicts with and therefore is preempted by federal law, and (3) in the alternative, treating the motion as one for summary judgment, the evidence shows that FFB is not a "construction lender" under California law and therefore is not bound by Plaintiff's stop notice.  FFB stated none of these defenses in its notice of removal.  <u>Compare</u> MTD <u>with</u> NOR.[8]

---

relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U.S.C. § 1442(a)(1).

[8] Here is the substantive portion of FFB's notice of removal:

1.  On February 28, 2012, [Plaintiff] filed a complaint to enforce bonded stop notice in Alameda County Superior Court.  Plaintiff seeks $1,187,950.00 together with prejudgment interest.
2.  Plaintiff alleges that [Defendant] acted as a "construction lender," as that term is defined under the California Civil Code, to Solyndra, a manufacturer of solar panel products, with regard to the construction of a work of improvement known as the Solyndra solar manufacturing facility (the "Project").  Plaintiff further alleges that [Defendant] was holder of construction funds allocated to the Project.
3.  Plaintiff alleges that it furnished labor, services, equipment and material for the installation of mechanical piping and components for tool hookup as part of the Project pursuant to written contract with Solyndra.  Plaintiff claims Solyndra made partial payment for the work Plaintiff provided, but on August 31, 2011, Solyndra announced it was closing its business, and did so without paying Plaintiff all of the amounts due and unpaid.
4.  On March 13, 2012, the United States Attorney's Office received copies of the Alameda County Superior Court summons and complaint from the U.S. Department of Treasury, which are attached as Exhibit A pursuant to 28 U.S.C. § 1446(a), and which constitute the only process or pleading which have been received.  We are advised that an FFB employee received the summons and complaint via U.S. Mail on March 7, 2012.  The Summons

United States District Court
For the Northern District of California

1    III. **DISCUSSION**

2      **A.**    **Motion to Remand**

3       FFB removed this case from state to federal court on the basis

4 of the federal-agency removal statute, 28 U.S.C. § 1442.[9] See NOR

5 ¶ 5. While the general removal statute, § 1441, is strictly

6 construed to favor remand, § 1442 is broadly construed to favor

7 removal. Durham, 445 F.3d at 1252-53. This presumption furthers

8 one of the key purposes of the statute: to provide federal

9 defendants who have been haled into state court for acts done in

10 the name of the federal government with an opportunity to have the

11 validity of defenses based on federal law heard in a federal forum.

12 See Willingham v. Morgan, 395 U.S. 402, 406-07 (1969); see also

13 Durham, 445 F.3d at 1252-53 (alluding to long history of federal

14 agents "get[ting] into trouble when they act within the States --

---

15
16         and Complaint has not yet been served on the United
        States Attorney's Office as required by Rule
        4(i)(1)(A(i)(ii), Fed. R. Civ. Proc. No trial is
17         scheduled on this case.
18     5.    This action must be removed to federal district court
        pursuant to 28 U.S.C. §§ 1442(a)(1) [sic] because it
        is a civil action against an agency and
19         instrumentality of the United States Government. This
        action may also be removed to federal district court
20         pursuant to 28 U.S.C. § 1331 (civil actions arising
        under the Constitution, laws or treaties of the United
21         States), and other applicable authorities.

22 [9] FFB's notice of removal also alludes to § 1331 (the federal-
23 question original-jurisdiction statute) and unspecified "other
applicable authorities." NOR ¶ 5. As FFB appears to concede, see
24 MTR Opp'n at 5, these are insufficient grounds for removal.
Section 1331 pertains to original jurisdiction, not removal
25 jurisdiction. Nor does § 1331 provide a basis for removal under
the general removal statute, § 1441, since Plaintiff's complaint
26 sets forth only a state-law claim and does not raise a federal
question. Hence, because this Court could not have had original
27 jurisdiction over Plaintiff's claim, FFB cannot remove under §
1441. See, e.g., Regal Stone Ltd. v. Longs Drug Stores California,
L.L.C., --- F. Supp. 2d ---, 2012 WL 685756, at *2 (N.D. Cal.). As
28 to the "other" authorities mentioned in FFB's removal notice, FFB
has not identified them and the Court deems that ground abandoned.

**United States District Court**
For the Northern District of California

1  whether they're enforcing unpopular tariffs in South Carolina in

2  the 1830s, killing recalcitrant moonshiners in self-defense in

3  Tennessee in the 1880s, or exposing servicemen to asbestos to make

4  military aircraft in the 1970s").  The Supreme Court has cautioned

5  lower courts not to frustrate this purpose with "a narrow, grudging

6  interpretation" of § 1442.  <u>Willingham</u>, 395 U.S. at 407.

7       Aided by this presumption, a federal defendant removing under

8  § 1442 must demonstrate three things: "(a) it is a 'person' within

9  the meaning of the statute; (b) there is a causal nexus between its

10 actions . . . and plaintiff's claims; and (c) it can assert a

11 'colorable federal defense.'"  <u>Durham</u>, 445 F.3d at 1251.  Plaintiff

12 does not challenge FFB on the first two criteria.[10]  <u>See</u> Reply at

13 3.  Neither does Plaintiff dispute that FFB can assert a colorable

14 federal defense.  <u>See</u> <u>id.</u>  Indeed, it would be difficult to do so

15 credibly, given that FFB has raised two colorable federal defenses

16 in its motion to dismiss.  MTD at 7-10 (sovereign immunity), 10-13

17 (conflict preemption).  Rather, Plaintiff argues that remand is

18 necessary because FFB failed to state the grounds of removal --

19 that is, it failed to articulate its federal defenses -- in the

20 notice of removal itself.  Relying on the Supreme Court opinion

21

22 [10] The Court is satisfied that the first two <u>Durham</u> criteria are
   met.  FFB is a "person" within the meaning of § 1442.  <u>See</u> 12
23 U.S.C. § 2283 (FFB is a federal corporation); 1 U.S.C. § 1 (in
   statutes, the word "person" presumptively includes corporations);
24 <u>Isaacson v. Dow Chem. Co.</u>, 517 F.3d 129, 135-36 (2d Cir. 2008)
   (nothing in § 1442 indicates intent to overcome presumption that
25 person includes corporations).  There also is a "causal nexus"
   between FFB's acts and Plaintiff's claim: As FFB acknowledges, the
26 Solyndra loan was "a perfect example of how Congress intended the
   FFB to work," MTD Reply at 12, and in taking the actions giving
27 rise to Plaintiff's claim, FFB clearly acted under color of office.
   <u>Durham</u> also requires that FFB have a colorable federal defense.  As
28 explained more fully herein, FFB does have such defenses.  They are
   set forth in FFB's motion to dismiss.

1   Mesa v. California, 489 U.S. 121 (1989), Plaintiff argues that a

2   federal defendant's failure to state its federal defenses in the

3   notice of removal itself, as compared to some other paper, strips

4   the federal court of the removal jurisdiction granted by § 1442.

5   MTR Reply at 3-5.

6       This position misapprehends the holding of Mesa.  In that

7   case, the government argued that a federal defendant seeking

8   removal under § 1442 only needed to show that he had been summoned

9   to court for an act done under color of office, regardless of

10  whether the act gave rise to a federal defense.  See Mesa, 489 U.S.

11  at 125, 134.  In other words, the government argued that federal

12  defendants need not assert a federal defense to remove under §

13  1442.  The Supreme Court rejected this argument, observing that the

14  government's view would "present grave constitutional problems."

15  Id. at 137.  That is because a federal defendant could remove a

16  case to federal court even if the case presented no controversy

17  "arising under" federal law, as required by Article III, Section 2

18  of the Constitution.  Id. at 136-37.  The Court observed:

19      Section 1442(a), in our view, is a pure jurisdictional
        statute, seeking to do nothing more than grant district
20      court jurisdiction over cases in which a federal officer
        is a defendant.  Section 1442(a), therefore, cannot
21      independently support Art. III "arising under"
        jurisdiction.  Rather, it is the raising of a federal
22      question in the officer's removal petition that
        constitutes the federal law under which the action
23      against the federal officer arises for Art. III purposes.
        The removal statute itself merely serves to overcome the
24      "well-pleaded complaint" rule which would otherwise
        preclude removal even if a federal defense were alleged.
25

26  Id. at 136.  Plaintiff interprets this passage to mean that, unless

27  the removal notice itself articulates a defense arising under

28  federal law, a federal court cannot exercise jurisdiction under §

1442.  MTR Reply at 4.  Plaintiff's view, though, confuses the

constitutional and statutory requirements for removal jurisdiction.

It is axiomatic that the judicial power of the United States

provided by Article III is broader than the jurisdiction actually

exercised by the federal courts, and that Congress may tailor that

jurisdiction by statute.  <u>Verlinden B.V. v. Cent. Bank of Nigeria</u>,

461 U.S. 480, 495 (1983); <u>see also</u> <u>Mireles v. Wells Fargo Bank,</u>

<u>N.A.</u>, 845 F. Supp. 2d 1034, 1047 (C.D. Cal. 2012) (citing <u>Libhart</u>

<u>v. Santa Monica Dairy Co.</u>, 592 F.2d 1062, 1064 (9th Cir. 1979))

("The right to remove a case to federal court is entirely a

creature of statute."); <u>Hunter v. United Van Lines</u>, 746 F.2d 635,

639 (9th Cir. 1984) ("Congress plainly has the power to confer

removal jurisdiction over cases in which only the defense is based

on federal law.").  Plaintiff reads <u>Mesa</u> as a case about the formal

or procedural -- that is, the statutory -- requirements of § 1442

removal.  But <u>Mesa</u> is a case about the <u>constitutional</u> requirements

of § 1442 removal.  It holds only that the Constitution requires

cases removed under § 1442 to present the federal court with a

controversy arising under federal law, but that, in a departure

from the usual, "well-pleaded complaint" rule, a defense may supply

the constitutionally requisite federal question.  This holding

simply does not address the question of where and how -- i.e., in

which paper -- the defense must appear.

That <u>Mesa</u> does not address this question is no surprise, for

although the <u>Mesa</u> Court focused on § 1442, it is § 1446 that

governs the form of the removal notice.  See <u>Ely Valley Mines, Inc.</u>

<u>v. Hartford Acc. & Indem. Co.</u>, 644 F.2d 1310, 1315 (9th Cir. 1981)

(applying procedural requirements of § 1446 where right to remove

**United States District Court**
For the Northern District of California

1   was provided by § 1442).  <u>Durham</u> suggests that the same presumption

2   in favor of removal that applies to § 1442 applies with equal force

3   to § 1446.  <u>See</u> 445 F.3d at 1253 (extending pro-removal presumption

4   to § 1446 "where the timeliness of a federal officer's removal is

5   at issue").  Whether it does or not, § 1446 requires a party

6   seeking removal to include nothing more than a "short and plain

7   statement of the grounds for removal."  28 U.S.C. § 1446(a).

8        Unfortunately, while FFB's notice of removal does include a

9   "short and plain statement," what it states is not actually the

10  "grounds for removal."  The removal notice merely recites, in

11  relevant part: "This action must be removed to federal district

12  court pursuant to 28 U.S.C. [§] 1442(a)(1) because it is a civil

13  action against an agency and instrumentality of the United States

14  Government."  NOR ¶ 5.  This statement is inadequate because it

15  does not supply facts that would permit Plaintiff or the Court to

16  determine that <u>Durham</u>'s three-pronged test for federal-agency

17  removal had been met, the relevant facts being the agency's

18  "personhood" under the statute, the required causal nexus, and the

19  agency's federal defenses.  445 F.3d at 1251.

20       Nevertheless, the defect in the removal notice is merely a

21  defect of form that does not strip this Court of jurisdiction.

22  Given that FFB clearly can assert some colorable federal defense,

23  the Court is not inclined to frustrate the Congressional purpose of

24  the federal-agency removal statute with a "grudging, narrow" ruling

25  that would remand this action to state court and thereby deprive

26  FFB of the opportunity to test its federal defenses in a federal

27  forum.  The appropriate course of action is for the Court to retain

28  jurisdiction but require FFB to comply with § 1446 by amending its

14

**United States District Court**
For the Northern District of California

1 notice of removal to state the _actual_ grounds for removal

2 jurisdiction.[11]  Frankly, the Court is perplexed as to why the U.S.

3 Attorney did not state them in the first place.  The government

4 cannot expect simply to wave toward § 1442 and then waltz into

5 federal court without making any showing that would allow a

6 plaintiff (or a district judge) to determine that removal was

7 proper.  See Gaus v. Miles, Inc., 980 F.2d 564, 567 (9th Cir. 1992)

8 (rejecting removal notice where defendant baldly concluded that

9 jurisdictional requirements were satisfied, "as if attempting to

10 recite some 'magical incantation'"); Sparta Surgical Corp. v. Nat'l

11 Ass'n of Sec. Dealers, Inc., 159 F.3d 1209, 1213 (9th Cir. 1998)

12 (directing district courts to test propriety of removal on basis of

13 the record extant "at the time of removal").[12]  Perhaps aware of

14 this, FFB appears to seek leave to amend its notice of removal in

15 the event that the Court finds it technically deficient.  See MTR

16 Opp'n at 6.

---

17 [11] Cf. Russell v. U.S. Department of Housing & Urban Development,
18 214 F. Supp. 2d 933 (W.D. Ark. 2002).  In that case, a federal
defendant removed to federal court, stating in its notice of
19 removal only that the case was "an action for specific performance
against an agency of the United States of America, and [was] thus
20 removable by the United States under [§ 1442]."  Id. at 934.  The
plaintiffs moved for remand on the ground that "their complaint
21 does not allege a federal claim and the removal notice does not
allege adequate grounds for removal under section 1442(a)(1)
22 because it fails to allege a colorable federal defense."  Id.  The
district court inquired whether it was "apparent from the removal
23 notice that [the federal agency] ha[d] a federal defense to the
complaint."  Id.  The court found that the removal notice was
24 "deficient in this respect," but retained jurisdiction regardless,
since the federal agency had "filed an amended notice of removal"
25 that set forth the specific defense it was raising.  Id.

26 [12] The removal statutes themselves clearly evince Congressional
concern about this sort of rote removal.  See 28 U.S.C. §§ 1446(a)
27 (reminding attorneys that removal notices are subject to Rule 11),
1447(c) (authorizing courts ordering remand to require defendants
28 to pay the "just costs and any actual expenses, including attorney
fees, incurred as a result of the removal").

1    Plaintiff argues that FFB should not be allowed to amend its
2    removal notice because the thirty-day period for removal provided
3    by § 1446(b) has long since elapsed.  MTR Reply at 6-8.  Plaintiff
4    is wrong.  First, the cases cited by Plaintiff stand only for the
5    uncontroversial proposition that, once the thirty-day period
6    elapses, a defendant is not permitted to amend the notice of
7    removal to add a "separate basis" for removal jurisdiction -- that
8    is, to state an entirely new reason.  ARCO Envtl. Remediation,
9    L.L.C. v. Dep't of Health & Envtl. Quality of Montana, 213 F.3d
10   1108, 1117 (9th Cir. 2000); see also Sonoma Falls Developers, LLC
11   v. Nevada Gold & Casinos, Inc., 272 F. Supp. 2d 919, 926 (N.D. Cal.
12   2003).  That is not what FFB seeks leave to do here.  The notice of
13   removal set forth the legal basis for removal, § 1442, as well as
14   facts which purport to justify removal on that ground, namely, the
15   fact that FFB is "an agency and instrumentality of the United
16   States Government."  NOR ¶ 5.  As explained above, that fact alone
17   is not enough to support removal, and FFB's notice of removal
18   should have supplied facts addressing the jurisdictional
19   requirements enunciated in Durham.  Nevertheless, amendment at this
20   point would not add a separate basis for jurisdiction; it would
21   merely clarify the factual underpinnings of the previously asserted
22   basis.  As the cases cited by Plaintiff recognize, that is
23   permissible.  E.g., ARCO, 213 F.3d at 1117.
24       Nothing in Bays is inconsistent with this conclusion, contrary
25   to Plaintiff's interpretation of that case.  MTR Reply at 7-8
26   (citing Bays v. Spectrum Sec. Servs., Case No. CV 10-04362 DDP
27   (MANx), 2010 U.S. Dist. LEXIS 112057 (C.D. Cal. Oct. 7, 2010)).  In
28   Bays, the district court specifically found that the defendant

1   "ha[d] not demonstrated that it ha[d] a colorable federal defense .
2   . . ."  2010 U.S. Dist. LEXIS 112057, at *4.  As such, the
3   defendant could not satisfy the jurisdictional requirements of
4   Article III.  See Mesa, 489 U.S. at 136-37.  In this case, however,
5   FFB has established that it has such defenses, so Bays is
6   inapposite.

7       In summary, the Court concludes that it has removal
8   jurisdiction over this case because FFB can assert colorable
9   federal defenses and the Court is otherwise satisfied that FFB
10  meets the criteria for removal under § 1442.  Supra note 10.  The
11  deficiencies in the notice of removal are merely technical and
12  hence amendable at any time.  The Court therefore DENIES
13  Plaintiff's motion to remand.  Consequently, Plaintiff's request
14  for an award of removal-related attorney fees, MTR at 15, is
15  DENIED.

16      Though the Court retains jurisdiction over this matter, FFB
17  still must comply with the formal requirements of § 1446.
18  Therefore, the Court ORDERS FFB to file, within seven (7) days of
19  the signature date of this Order, an amended notice of removal that
20  sets forth the grounds of removal consistent with § 1446, Durham,
21  and the guidance herein.

22  ///

23      **B.   Motion to Dismiss**

24      FFB moves to dismiss Plaintiff's complaint under Rule 12(b)(1)
25  or, in the alternative, to enter summary judgment in its favor.
26  FFB marshals three arguments toward these ends.  First, FFB
27  contends that, because it is an instrumentality of the U.S.
28  government, sovereign immunity shields it from Plaintiff's state-

**United States District Court**
For the Northern District of California

law claim for enforcement of the bonded stop notice.  Second, FFB argues that, as applied in the circumstances of this case, California's stop-notice law conflicts with and therefore is preempted by the FFB Act and the Energy Policy Act.  Finally, in the event that the Court does not dismiss the case under Rule 12(b)(1), FFB asks the Court to treat its motion as one for summary judgment and find that FFB is not a "construction lender," as California's stop-notice law defines that term.  The Court addresses each argument in turn.

### 1.   Sovereign Immunity

#### a.   Legal Standard

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." F.D.I.C. v. Meyer, 510 U.S. 471, 475 (1994).  "Sovereign immunity is jurisdictional in nature.  Indeed, the terms of the United States' consent to be sued in any court define that court's jurisdiction to entertain the suit." Id. (internal quotation marks and brackets omitted); see also Tobar v. United States, 639 F.3d 1191, 1195 (9th Cir. 2011) ("The waiver of sovereign immunity is a prerequisite to federal-court jurisdiction.").  Though defendant FFB is the party who has moved to dismiss this case, Plaintiff is the one who bears the burden of establishing that FFB lacks sovereign immunity and hence that federal jurisdiction is proper, notwithstanding Plaintiff's attempts to remand the case.  See Levin v. United States, 663 F.3d 1059, 1063 (9th Cir. 2011) (plaintiff bears burden of establishing waiver of sovereign immunity); DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 342 n.3 (2006) (burden of establishing federal jurisdiction is borne by the party asserting it at the time it is

**United States District Court**
For the Northern District of California

1  challenged, regardless of previous positions vis-à-vis removal).

2      The Supreme Court has set forth a two-step inquiry for

3  determining whether sovereign immunity shields a government agency

4  from a particular claim. <u>Meyer</u>, 510 U.S. at 484; <u>U.S. Postal Serv.</u>

5  <u>v. Flamingo Indus. (USA) Ltd.</u>, 540 U.S. 736, 743 (2004).  In the

6  first step, the Court must ask whether Congress has waived the

7  government agency's sovereign immunity.  <u>Meyer</u>, 510 U.S. at 484;

8  <u>Flamingo Indus.</u>, 540 U.S. at 743.  If it has, the Court asks the

9  second question, which is "whether the source of substantive law

10  upon which the claimant relies provides an avenue for relief."

11  <u>Meyer</u>, 510 U.S. at 484; <u>see also</u> <u>Flamingo Indus.</u>, 540 U.S. at 743

12  (using <u>Meyer</u> test).

13      <u>Meyer</u> and <u>Flamingo Industries</u> stand for the idea that a waiver

14  of sovereign immunity is a necessary but not sufficient condition

15  for imposing liability on a federal defendant.  The waiver makes

16  liability possible, but only if the underlying claim is one that

17  can reach the federal defendant.  In <u>Meyer</u>, the predecessor to the

18  FDIC, the Federal Savings and Loan Insurance Corporation ("FSLIC"),

19  fired one of its employees.  The former employee brought a <u>Bivens</u>[13]

20  action on the theory that FSLIC had "deprived him of a property

21  right (his right to continued employment under California law)

22  without due process of law in violation of the Fifth Amendment."

23  510 U.S. at 474.  The Supreme Court held that no <u>Bivens</u> action

24  could lie against the FSLIC despite the agency's ability to "sue

25  and be sued."  <u>Id.</u> at 483-84.  The Court reasoned that the source

26

27  [13]  In <u>Bivens v. Six Unknown Named Agents of Fed. Bureau of</u>
   <u>Narcotics</u>, 403 U.S. 388 (1971), the Supreme Court inferred the

28  existence of "a cause of action for damages against federal agents
   who allegedly violated the Constitution."  <u>Meyer</u>, 510 U.S. at 473.

**United States District Court**
For the Northern District of California

of substantive law underlying the plaintiff's claim -- the Court's own earlier decision in Bivens -- provided a cause of action against government agents, but not government agencies like FSLIC. Id. at 483-486.

Similarly, in Flamingo Industries, a company that had been supplying mail sacks to the United States Postal Service ("USPS") sued USPS for antitrust violations after USPS terminated its contract. 540 U.S. at 738. Noting that Congress had authorized USPS to "sue and be sued," a unanimous Supreme Court concluded that the plaintiff nevertheless could not assert an antitrust claim against USPS because the source of substantive law in that case -- the Sherman Act -- only provided a cause of action against "persons," as defined by the statute. Id. at 744-45. The Court held that USPS, as part of the executive branch of the federal government, was not a "person" within the meaning of the Sherman Act, and therefore the Sherman Act simply did not provide an avenue for relief against USPS, notwithstanding its lack of sovereign immunity. Id. at 745-47.

Thus, the two-step Meyer test obligates courts to inquire not only whether Congress waived a federal defendant's sovereign immunity, but also whether the plaintiff's claim can reach the federal defendant, notwithstanding its lack of immunity. The first question asks, in essence, whether the government has put down its shield; the second, whether plaintiff has been given a sword.[14]

---

[14] This second question is often framed as one of Congressional intent, even though in Meyer the lawmaking body in question was actually the Bivens Court. E.g., id. at 744; Currier v. Potter, 379 F.3d 716, 724-26 (9th Cir. 2004); Anselma Crossing, L.P. v. U.S. Postal Serv., 637 F.3d 238, 242 n.6 (3d Cir. 2011); MB Fin. Group, Inc. v. U.S. Postal Serv., 545 F.3d 814, 820 (9th Cir. 2008) (Tallman, J., dissenting). Meyer therefore suggests that the

**United States District Court**
For the Northern District of California

        b.   Analysis

1   As noted previously, the question of whether California's

2   stop-notice laws reach FFB appears to be one of first impression.

3   Proceeding to the first step in the Meyer analysis, the Court

4   agrees with the parties that Congress waived FFB's sovereign

5   immunity by giving FFB the power to "sue and be sued."  12 U.S.C. §

6   2289; MTD at 7, MTD Opp'n at 10-11.  "[S]uch sue-and-be-sued

7   waivers are to be liberally construed, notwithstanding the general

8   rule that waivers of sovereign immunity are to be read narrowly in

9   favor of the sovereign."  Meyer, 510 U.S. at 480 (internal

10  quotation marks and citations omitted).  "It must be presumed that

11  when Congress launched a governmental agency into the commercial

12  world and endowed it with authority to 'sue or be sued,' that

13  agency is not less amenable to judicial process than a private

14  enterprise under like circumstances would be."  Flamingo Indus.,

15  540 U.S. at 742 (quoting Fed. Hous. Admin., Region No. 4 v. Burr,

16  309 U.S. 242, 245 (1940)) (brackets omitted); see also Meyer, 510

17  U.S. at 482-83 (a government entity authorized to "sue and be sued"

18  is subject to no less liability than a private corporation).

19  Hence, "agencies authorized to 'sue and be sued' are presumed to

20  have fully waived immunity."  Meyer, 510 U.S. at 481 (internal

21  quotation marks omitted).[15]  Because Congress authorized FFB to sue

_____

"avenue of relief" analysis does not turn on what the United States
Congress intended; rather, it turns on whether the substantive body
of law gives plaintiff a claim upon which relief can be granted,
regardless of whether Congress is the source of the substantive
body of law.  This distinction, though admittedly fine, matters:
Framing the matter as one of Congressional intent implies that only
Congress can provide an "avenue of relief," which, in a case such
as this one where a plaintiff appeals to state law for relief,
unhelpfully suggests the existence of a federalism issue which is
not actually present.
[15] The government overcomes this presumption only if it makes a

21

**United States District Court**
For the Northern District of California

1 and be sued, the Court holds that Congress fully waived FFB's

2 sovereign immunity and, accordingly, proceeds to the second step of

3 the <u>Meyer</u> analysis.

4     In that step, the Court must determine whether the substantive

5 law upon which Plaintiff relies, California's stop-notice law,

6 provides Plaintiff with an "avenue for relief" against FFB.  <u>Meyer</u>,

7 510 U.S. at 484.  Accordingly, the Court "look[s] to the statute."

8 <u>Flamingo Indus.</u>, 540 U.S. at 744.  The Court concludes that

9 California's stop-notice laws do provide Plaintiff with an avenue

10 for relief from FFB.  Unlike the <u>Bivens</u> action asserted in <u>Meyer</u>

11 and the antitrust claim in <u>Flamingo Industries</u>, nothing in

12 California's stop-notice law is inconsistent with enforcement

13 against the federal government, or, more specifically, against an

14 instrumentality of the federal government that has been stripped of

15 its immunity and launched into the commercial world.

16     Before turning to the statutory text, the Court observes that

17 California's stop-notice laws are part of "an integrated scheme

18 obviously designed to provide maximum protection to laborers and

19 materialmen."  <u>Mech. Wholesale Corp. v. Fuji Bank, Ltd.</u>, 42 Cal.

20 App. 4th 1647, 1656 (Cal. Ct. App. 1996).  This scheme is

21 "remedial" in nature and intended to be "liberally construed."

22

---

23       clear showing that certain types of suits are not
24       consistent with the statutory or constitutional scheme,
      that an implied restriction of the general authority [to
25       sue and be sued] is necessary to avoid grave interference
      with the performance of a governmental function, or that
26       for other reasons it was plainly the purpose of Congress
      to use the "sue and be sued" clause in a narrow sense.

27 <u>Meyer</u>, 510 U.S. at 480 (quoting <u>Fed. Hous. Admin., Region No. 4 v.</u>

28 <u>Burr</u>, 309 U.S. 242, 245 (1940)).  FFB has not attempted to make
such a showing here.

**United States District Court**
For the Northern District of California

1   <u>Connolly Dev., Inc. v. Sup. Ct.</u>, 17 Cal. 3d 803, 826-27 (1976).

2   Laborers and materialmen may assert the stop-notice remedy against

3   either (1) the owner of the work of an improvement or (2) the

4   project's "construction lender." <u>Id.</u> at 809.  Plaintiff's theory

5   is that FFB was a "construction lender" for purposes of the

6   Solyndra project.

7         "Construction lender" means [1] any mortgagee or
        beneficiary under a deed of trust lending funds with
8       which the cost of the work of improvement is, wholly or
        in part, to be defrayed, or any assignee or successor in
9       interest of either, or [2] any escrow holder or other
        party holding any funds furnished or to be furnished by
10       the owner or lender or any other person as a fund from
        which to pay construction costs.

11   Cal. Civ. Code § 3087 (brackets added).[16]

12         Plaintiff argues that FFB falls within the second portion of

13   the definition, which applies to any party who holds any "fund from

14   which to pay construction costs."  MTD Opp'n at 11-12.  In essence,

15   Plaintiff maintains that because FFB held funds for Solyndra that

16   were used for construction, FFB is a construction lender and hence

17   subject to Plaintiff's stop notice.  The Court agrees.

18         FFB does not dispute that it was a lender, as that term is

19   commonly understood.  Indeed, it would be difficult to do so

20   because FFB held a note from Solyndra in which Solyndra agreed to

21   repay FFB the monies advanced.  FFB's argument turns, rather, on

22   the notion that it did not "hold" funds.  According to FFB,

23   California's "stop notice law was intended to apply to a lender who

24   has loaned a sum certain, but who retains the proceeds as security

25

26   [16] As discussed in note 6, effective July 1, 2012, the California
      legislature restyled, reorganized, and renumbered the stop-notice
27   laws.  The statutory definition of the term "construction lender,"
      formerly set forth at section 3087, is now set forth at section
28   8006, where it has been reorganized into subsections as suggested
      by the brackets added herein, but remains substantively the same.

1    or in loan fund accounts."  MTD at 9.  In contradistinction to such

2    a lender, FFB characterizes itself as merely having "purchased a

3    promissory note that was 100% guaranteed by the Secretary of

4    Energy" and "advanced funds only after (1) a request was made by

5    the borrower, and (2) the request was approved by the Secretary of

6    Energy."  <u>Id.</u>  FFB emphasizes that it exercised no discretion over

7    whether to approve advances requested by Solyndra; that discretion

8    resided exclusively with the Secretary.  FFB asserts that "[t]here

9    are no undrawn funds sitting in an account at FFB in Solyndra's

10   name," the implication being that there are no funds for Plaintiff

11   to attach.

12        While FFB offers a number of formal distinctions between

13   itself and a typical, private lender, FFB never establishes how

14   these distinctions amount to a difference.  What transpired here,

15   stripped of its labels, is that a bank made a loan to a borrower to

16   fund a construction project.  Instead of the usual deed of trust,

17   the bank accepted as security the guarantee of the federal

18   government in the person of the Secretary of Energy.  Though the

19   Secretary oversaw whether, when, and to whom the monies would be

20   disbursed, FFB actually disbursed the funds.  FFB did so pursuant

21   to a contractual arrangement with Solyndra which committed a

22   maximum amount of money to Solyndra which Solyndra could, and did,

23   use to pay construction costs.  In short, Solyndra's right to use

24   money to pay construction costs constituted the "construction

25   fund."  The fact that Solyndra had the right to use funds provided

26   by FFB is what made FFB the "construction lender."

27        FFB argues that the stop-notice laws can reach only private

28   banks or like entities who lend a "sum certain" which then resides

1   in a dedicated account.  MTD at 9, 10.  First, that is not true.

2   The statutory definition of "construction lender" applies by its

3   plain language to a variety of parties, such as escrows and

4   unidentified "other" parties.  At least one California treatise

5   notes that even fire or earthquake insurance carriers may be deemed

6   "construction lenders" under the statute.  Cal. Constr. L. Manual §

7   6:110 (6th ed.).  The definition is simply more expansive than FFB

8   would have it.  Second, assuming that FFB's definition were correct

9   and the stop-notice laws contemplated only the lenders of a sum

10  certain who held funds in a dedicated account, it is not clear on

11  the record before the Court that what transpired in this case is

12  meaningfully different from that: A bank, albeit a federal one,

13  made a loan to a borrower to fund a construction project.  Third,

14  FFB's position would make the efficacy of California's stop-notice

15  laws depend on the picayune matter of which label is affixed to an

16  account.  That result is inconsistent with the California cases

17  that counsel a liberal construction of the stop-notice laws to

18  effect their remedial purpose, that remedial purpose being the

19  vindication of rights to payment held by laborers and materialmen.

20  It also is inconsistent with the statutory definition of a

21  "construction lender," which describes construction funds in a

22  functional way: They are, simply, "funds furnished or to be

23  furnished . . . as a fund from which to pay construction costs."

24  Cal. Civ. Code § 3087 (superseded July 1, 2012).  The law says

25  nothing about who must furnish the funds, to whom, or in what

26  manner.  The restyled version of the statutory definition makes its

27  functional nature even more plain: It states that the term

28  "construction lender" encompasses persons providing funds "with

**United States District Court**
For the Northern District of California

1  which the cost of all or part of a work of improvement is to be

2  paid." Id. § 8006.  This definition is functional, flexible, and,

3  with respect to the Solyndra loan, applicable to FFB.

4      Considering FFB in light of its being subject to no less

5  liability than a private corporation, Meyer, 510 U.S. at 482-83,

6  the Court sees A-1 Door as analogous to this case.  A-1 Door &

7  Materials Co. v. Fresno Guarantee Sav. & Loan Ass'n, 61 Cal. 2d 728

8  (Cal. 1964).  In that case, a defendant savings and loan

9  association ("S&L") made a loan to the owners of unimproved real

10 property so that the owners could build on the land.  Id. at 731.

11 The owners executed promissory notes and then assigned the loan

12 proceeds to the S&L, who agreed to disburse them in installments as

13 the project went along.  Id.  Construction halted on the project

14 and the S&L retained the loan proceeds.  Id.  Unpaid materialmen

15 issued a stop notice and then sued the S&L for enforcement.  Id.

16 The California Supreme Court, in holding that the S&L could not use

17 unexpended loan proceeds to reduce the amount of the owners'

18 indebtedness or to complete construction, described the creation of

19 a construction fund.  It said that a construction fund was created

20 when the S&L "lent specified amounts to the owners for construction

21 purposes, and the owners executed promissory notes for, and agreed

22 to pay interest on, the full amount of each loan." Id. at 734-35.

23 That is essentially what happened here, though FFB paid the money

24 to Solyndra's creditors rather than directly to Solyndra itself.

25 FFB's insistence to the contrary merely quibbles on the meaning of

26 the phrase "construction fund."  To agree with FFB in light of A-1

27 Door, the Court would have to find that FFB's loan was not one "for

28 construction purposes."  No party has asked the Court to find that

1  fact.  Accordingly, the Court rejects FFB's contention that it did
2  not make a construction loan to Solyndra and, hence, that it did
3  not serve as a construction lender within the meaning of
4  California's stop-notice laws.

5      FFB's other arguments are also unavailing.  FFB cites <u>Marcus</u>
6  <u>Garvey Square</u> for the proposition that the existence of sovereign
7  immunity is determined by the practical test of whether a judgment
8  must be satisfied from the United States Treasury.  MTD at 10; MTD
9  Reply at 4-5 (citing <u>Marcus Garvey Square, Inc. v. Winston Burnett</u>
10 <u>Construction Co. of California, Inc.</u>, 595 F.2d 1126, 1132 (9th Cir.
11 1979)).  The first problem with that position is that, if <u>Marcus</u>
12 <u>Garvey Square</u> actually meant what FFB suggests it does, it would be
13 in obvious conflict with the later-decided cases <u>Meyer</u> and <u>Flamingo</u>
14 <u>Industries</u>, since it would supplant their two-step analysis with
15 the single question of whether the judgment sought by the plaintiff
16 would be satisfied from the U.S. Treasury.  The second problem is
17 that <u>Marcus Garvey Square</u> does not mean that.  It speaks only to
18 the question of whether the United States' sovereign immunity is
19 waived by a statute authorizing an agency head to sue and be sued,
20 when the United States rather than the agency head is the real
21 party in interest.  Those are not the facts of this case; FFB has
22 been sued in its own name and Plaintiff does not seek to reach past
23 FFB to the United States itself.  The third problem is that, if
24 sovereign immunity barred any attempt to secure a judgment against
25 a federal defendant that would be paid from the U.S. Treasury, it
26 is unclear how Congress ever could waive it.

27     FFB also suggests that the California state legislature lacks
28 the authority to "give[] a contractor the right to recover from the

1  United States Treasury."  MTD at 10; MTD Reply at 4, 5.  To the

2  extent that FFB is suggesting that California cannot waive the

3  federal government's sovereign immunity, FFB is correct.  But the

4  suggestion misses the point.  As the Court discussed during the

5  first step of the Meyer analysis, the California state legislature

6  did not waive FFB's sovereign immunity.  Congress did.  And when

7  Congress did so, it subjected FFB to liability in the manner of a

8  private corporation.  Private corporations are subject to stop

9  notices under California law.  Accordingly, so is FFB.

10      FFB suggests in passing that it cannot be subjected to a stop

11  notice because it has and had no contractual relationship with

12  Plaintiff.  MTD Reply at 4.  But the very nature of a stop notice

13  is to supply laborers and materialmen with a remedy despite their

14  lack of contractual relationship with the construction lender.

15  E.g., Connolly, 17 Cal. 3d at 809 ("Failure of the owner or lender

16  to withhold money as required by the [stop] notice may render him

17  personally liable to the claimant, notwithstanding the absence of

18  privity of contract."); Mech. Wholesale Corp. v. Fuji Bank, Ltd.,

19  42 Cal. App. 4th 1647, 1659 (Cal. Ct. App. 1996) (The stop-notice

20  remedy "is a liability which exists in the absence of any

21  contractual privity whatsoever.").  The lack of a contract between

22  FFB and Plaintiff presents no bar to the relief Plaintiff seeks.

23      The root of FFB's objection to Plaintiff's stop notice appears

24  to be that FFB is a government bank rather than a private bank and

25  "simply does not work the way a private bank does."  MTD Reply at

26  7; MTD at 9.  But whether FFB "works" like a private bank in all of

27  its particulars is not the question here.  The question is whether

28  FFB acted as a construction lender under California's stop-notice

**United States District Court**
For the Northern District of California

1  laws.  The Court concludes that it did.  When Congress launched FFB

2  into the commercial world to serve as a lender for, among other

3  things, construction projects, it waived FFB's sovereign immunity

4  and hence subjected FFB to at least as much potential liability as

5  a private corporation.  See Flamingo Indus., 540 U.S. at 742;

6  Meyer, 510 U.S. at 482-83.  FFB cannot now escape liability solely

7  by virtue of its status as a federal entity.  Congress foreclosed

8  that defense when it allowed FFB to sue and be sued.  The only

9  remaining question, then, is whether a California stop notice can

10  reach an entity that loans money for a construction project, as FFB

11  did.  It can.

12      Because (1) Congress fully waived FFB's sovereign immunity and

13  (2) California's stop-notice law provides Plaintiff with an avenue

14  for relief from a construction lender such as FFB, FFB's Rule

15  12(b)(1) motion to dismiss this action on sovereign immunity

16  grounds is DENIED.

17          **2.   Conflict Preemption**

18              a.   Legal Standard

19      FFB argues that Plaintiff's claim for enforcement of its stop

20  notice must be dismissed because enforcement would conflict with,

21  and therefore is preempted by, the FFB Act and the Energy Policy

22  Act.  Under the Supremacy Clause of the U.S. Constitution,[17]

23  _____

24  [17]   This Constitution, and the Laws of the United States
        which shall be made in Pursuance thereof; and all
25      Treaties made, or which shall be made, under the
        Authority of the United States, shall be the supreme Law
26      of the Land; and the Judges in every State shall be bound
        thereby, any Thing in the Constitution or Laws of any
27      State to the Contrary notwithstanding.

28  U.S. Const. art. VI, cl. 2.

**United States District Court**
For the Northern District of California

1  Congress has the power to preempt state law.  <u>Crosby v. Nat'l</u>

2  <u>Foreign Trade Council</u>, 530 U.S. 363, 372 (2000).  Courts usually

3  think of preemption as coming in three kinds: express, field, and

4  conflict.[18]  <u>See</u> <u>id.</u>; <u>Kroske v. U.S. Bank Corp.</u>, 432 F.3d 976, 981

5  (9th Cir. 2005).  FFB invokes only the third kind, conflict

6  preemption.

7       "[S]tate law is preempted by federal law to the extent that it

8  actually conflicts with federal law." <u>Ctr. for Bio-Ethical Reform,</u>

9  <u>Inc. v. City & Cnty. of Honolulu</u>, 455 F.3d 910, 917 (9th Cir. 2006)

10  (quoting <u>Pac. Gas & Elec. Co. v. State Energy Res. Conservation &</u>

11  <u>Dev. Comm'n</u>, 461 U.S. 190, 204 (1983)).  A state law conflicts and

12  is thus preempted "where [1] it is impossible for a private party

13  to comply with both state and federal requirements, or where [2]

14  state law stands as an obstacle to the accomplishment and execution

15  of the full purposes and objectives of Congress." <u>Kroske</u>, 432 F.3d

16  at 981 (quoting <u>English</u>, 496 U.S. at 79) (brackets added).

17  Additionally, courts must assume that "the historic police powers

18  of the States" are not preempted "unless that [is] the clear and

19  manifest purpose of Congress."  <u>Id.</u>  "The presumption of non-

20  preemption does not apply, however, when the State regulates in an

21  area where there has been a history of significant federal

22  presence."  <u>Id.</u> (internal quotation marks omitted).

23            b.    <u>Analysis</u>

24

25

_____

26  [18] These three categories are not "rigidly distinct.  Indeed, field
    pre-emption may be understood as a species of conflict pre-emption:
27  A state law that falls within a pre-empted field conflicts with
    Congress' intent (either express or plainly implied) to exclude
28  state regulation." <u>English v. Gen. Elec. Co.</u>, 496 U.S. 72, 79 n.5
    (1990).

1    The Court begins by observing that California's stop-notice
2    law lies squarely within an area traditionally regulated by the
3    states pursuant to their historic police powers -- construction law
4    generally and specifically the remedial scheme protecting
5    construction contractors' rights to payment on contracts.  The
6    stop-notice remedy at issue here is a creature entirely of
7    California statute.  <u>Mech. Wholesale Corp.</u>, 42 Cal. App. 4th at
8    1657-58.  Neither party argues that there has been a "history of
9    significant federal presence" in the area of California's
10   mechanics' lien and stop-notice laws, nor is the Court aware of any
11   such presence.  Neither do the parties point to any clear or
12   manifest signal that Congress passed the FFB Act or Energy Policy
13   Act with the intent of preempting California's stop-notice law.
14   The Court proceeds, therefore, from the assumption that Congress
15   did not intend to preempt California's stop-notice laws.  This
16   presumption means FFB bears the burden of showing Congressional
17   intent to preempt state law.  <u>See</u> <u>Chamberlan v. Ford Motor Co.</u>, 314
18   F. Supp. 2d 953, 962 (N.D. Cal. 2004).

19   FFB does not argue that compliance with both federal law and
20   California's stop-notice law would be impossible in this case.  <u>See</u>
21   <u>Kroske</u>, 432 F.3d at 981.  Rather, it argues that the stop-notice
22   remedy sought by Plaintiff would present "an obstacle to the
23   accomplishment and execution of the full purposes and objectives of
24   Congress," <u>id.</u>, specifically, to Congress's purposes and objectives
25   for the Energy Policy Act and the FFB Act.  MTD at 11-13, MTD Reply
26   at 7-9.  The argument is unavailing.

27   With respect to the Energy Policy Act, FFB simply fails to
28   identify any statutory purpose or objective with which enforcement

31

**United States District Court**
For the Northern District of California

1  of a stop notice would conflict.  This is unsurprising: The Energy

2  Policy Act provides a mechanism for providing federally-backed

3  loans to the makers of innovative energy technologies, and it is

4  difficult to envision how enforcement of a construction

5  contractor's stop notice could impede this scheme.  But regardless

6  of whether such an impediment could be envisioned, FFB bears the

7  burden of showing that California's stop-notice law presents an

8  obstacle to Congress's objectives for the Energy Policy Act and, by

9  failing to address those objectives with any specificity, it fails

10  to carry its burden.

11      With respect to the FFB Act, FFB cites Congress's statement

12  that its purpose in passing the FFB Act was "[1] to assure

13  coordination of [federally assisted borrowing] programs with the

14  overall economic and fiscal policies of the Government, [2] to

15  reduce the cost of Federal and federally assisted borrowings from

16  the public, and [3] to assure that such borrowings are financed in

17  a manner least disruptive of private financial markets and

18  institutions." 12 U.S.C. § 2281 (brackets added).  FFB focuses its

19  conflict-preemption argument on the second aspect of Congress's

20  purpose, the reduction of costs borne by the public in financing

21  federal borrowing programs like the one in which Solyndra

22  participated.[19]  MTD at 12; MTD Reply at 9.  FFB argues that

23  requiring FFB to make good on Plaintiff's stop notice would

24  undermine its ability to limit the cost of federally-backed

25  _____

26  [19] FFB makes glancing reference to Congress's stated object of
    coordination of federal borrowing programs, MTD Reply at 8, but

27  never explains how enforcement of a stop notice would or even could
    impede the ability of the federal government to "coordinate" the

28  interactions of federal agencies with the private lending market.

borrowing programs. <u>Id.</u> This argument fails because it proves too much. FFB's position, if accepted, would mean that <u>any</u> state law whose enforcement resulted in increased costs for FFB would be conflict-preempted. That cannot possibly have been Congress's intent. A federal agency's diffuse, undifferentiated interest in reducing costs cannot be enough to preempt state law in the face of the presumption against preemption that applies in areas of traditional state regulation.[20] Neither can FFB's argument be squared with Congress's express authorization for FFB to purchase and be sued on obligations like the promissory note it purchased from Solyndra. Enforcement of Plaintiff's stop notice does not clearly or manifestly conflict with the purposes or objectives of the FFB Act.

Because FFB has not met its burden of showing that enforcing California's stop-notice law in this case would impermissibly hamper the purpose and objectives of either the FFB Act or the Energy Policy Act, FFB's Rule 12(b)(1) motion to dismiss this action on conflict preemption grounds is DENIED.

---

[20] Additionally, materials provided by FFB suggest that Congress largely achieved its objective of saving taxpayer funds simply by creating FFB. <u>See generally</u> McNamar Report. Before FFB, a multiplicity of federal agencies had engaged in loan-guarantee programs, with the loans being sourced from private lending markets. The influx of federal agencies had the unintended effect of raising demand for private lending and hence increasing interest rates, at the expense of the taxpayer. Congress created FFB in part so that the federal government's left hand would know what its right hand was doing; hence, the emphasis in 12 U.S.C. § 2281 on "coordination" between federal agencies and minimizing "disruption" in private lending markets. The evidence supplied by FFB tends to show that Congress largely accomplished its cost-saving objective simply by creating FFB. <u>See</u>, <u>e.g.</u>, <u>id.</u> at 14-15. It does not tend to show that Congress intended to shield FFB from any suit under state law which could raise costs for federal taxpayers. One wonders why, if Congress meant to do that, it did not simply preserve FFB's sovereign immunity.

United States District Court
For the Northern District of California

**3.   California's Definition of "Construction Lender"**

FFB requests that if the Court denies its Rule 12(b)(1) motion, the Court treat the motion as one for summary judgment and enter judgment in its favor on the ground that FFB is not a construction lender under California law.  However, as discussed above, FFB was such a construction lender with respect to the Solyndra project.  Therefore, to the extent that FFB's motion is one for summary judgment, that motion is DENIED.

**IV.   CONCLUSION**

For the foregoing reasons, the Court DENIES Plaintiff Kinetic Systems, Inc.'s motion to remand this action to California state court.  Defendant Federal Financing Bank is hereby ORDERED to comply with 28 U.S.C. § 1446 by submitting an amended notice of removal within seven (7) days of the signature date of this Order and consistent with the guidance herein.

Additionally, the Court DENIES Defendant Federal Financing Bank's motion to dismiss this action on sovereign-immunity and conflict-preemption grounds.  To the extent that Defendant's motion is construed as one seeking summary judgment on the ground that Defendant is not a "construction lender" under California law, that motion, too, is DENIED.

The parties may now commence court-sponsored mediation pursuant to the Court's August 15, 2012 approval of their stipulation to do so.  ECF No. 36 ("ADR Order").  The ADR Order set a deadline for completing mediation: ninety (90) days after resolution of the pending motions to remand and dismiss.  Those motions now being resolved, the mediation deadline is set.  The

1    parties shall complete court-sponsored mediation within ninety (90)

2    days of the signature date of this Order.

3        Following mediation, both parties shall appear for a case

4    management conference at 10:00 a.m. on Friday, January 11, 2013, in

5    Courtroom One, United States Courthouse, 450 Golden Gate Avenue,

6    San Francisco, California.

7

8        IT IS SO ORDERED.

9

10   Dated: September 14, 2012        

11                                    _____
                                      UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California