IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KINETIC SYSTEMS, INC., | ) Case No. 12-1619-SC |
| | ) |
| Plaintiff, | ) ORDER DENYING PLAINTIFF'S |
| | ) MOTION TO REMAND AND |
| v. | ) DENYING DEFENDANT'S MOTION |
| | ) TO DISMISS |
| FEDERAL FINANCING BANK and DOES 1 | ) |
| through 25, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## I.   INTRODUCTION

This lawsuit stems from the closure of Solyndra, a Fremont, California-based maker of solar panel technology.  In September 2009, the U.S. Department of Energy ("DOE"), Solyndra, and Defendant Federal Financing Bank ("FFB") entered into a series of agreements by which FFB, at the behest of DOE, purchased from Solyndra a promissory note in the amount of $535 million.  DOE guaranteed the note.  Solyndra used these funds to begin construction on a manufacturing facility (the "Project"), but, in August 2011, before the facility opened, Solyndra abruptly closed.

Plaintiff Kinetic Systems, Inc. ("Plaintiff") is a California contractor.  Plaintiff alleges that it performed $2.870 million worth of work on the Project and is still owed roughly $1.187

United States District Court
For the Northern District of California

1   million.  After Solyndra closed, Plaintiff served a bonded stop
2   notice on FFB -- that is, it claimed a right to be paid out of
3   excess construction funds allegedly held by FFB.  When FFB did not
4   pay, Plaintiff sued FFB in California state court for enforcement
5   of the bonded stop notice, whereupon FFB removed to this Court.

6       Two motions are now pending, both fully briefed and suitable
7   for decision without oral argument.  The first motion, filed by
8   Plaintiff, asks the Court to remand this action to state court.
9   ECF Nos. 10 ("MTR"), 30 ("MTR Opp'n"), 31 ("MTR Reply").  The
10  second motion, filed by FFB, asks the Court to dismiss the case
11  under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-
12  matter jurisdiction, or, in the alternative, to enter summary
13  judgment in favor of FFB.  ECF Nos. 6 ("MTD"), 19 ("MTD Opp'n"), 28
14  ("MTD Reply").  FFB has moved for dismissal under Rule 12(b)(1)
15  because it asserts the defenses of sovereign immunity and conflict
16  preemption, which are jurisdictional in nature.  As for the summary
17  judgment portion of its motion, FFB argues that it is not a
18  "construction lender," as California law defines that term.  The
19  question of whether California's stop-notice laws reach FFB appears
20  to be one of first impression, as neither party has cited any case
21  directly addressing the point, nor is the Court aware of any.

22      For the reasons set forth below, the Court DENIES Plaintiff's
23  motion to remand because FFB has a "colorable federal defense,"
24  Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1251 (9th Cir.
25  2006), namely, the federal defenses raised in its Rule 12(b)(1)
26  motion.  The Court, however, DENIES FFB's Rule 12(b)(1) motion:
27  Though FFB's jurisdictional defenses are "colorable" for purposes
28  of removal, they are not meritorious.  The Court also denies FFB's

2

United States District Court
For the Northern District of California

1  request for summary judgment because FFB has not shown that it

2  falls outside California's definition of a "construction lender."

3

4  **II.   BACKGROUND**

5       Understanding this dispute requires an understanding of: the

6  nature of FFB; the framework of the program by which FFB provided

7  financing guaranteed by DOE; and the details of the particular

8  arrangement between Solyndra, DOE, and FFB.   The Court reviews

9  those topics before recounting the events that led Plaintiff to

10  issue a bonded stop notice to FFB and hence to this lawsuit.

11       **A.   FFB**

12       Nearly forty years ago, Congress created FFB by passing the

13  Federal Financing Bank Act of 1973, Pub. L. No. 93-224, 87 Stat.

14  937 (1973) ("FFB Act"), codified at 12 U.S.C. § 2281 et seq.

15  Congress found that "demands for funds through Federal and

16  federally assisted borrowing programs [were] increasing faster than

17  the total supply of credit and that such borrowings [were] not

18  adequately coordinated with overall Federal fiscal and debt

19  management policies."  12 U.S.C. § 2281.  Federal agencies

20  administering increasingly popular loan-guarantee programs were

21  using private lenders to furnish the loans, which had the

22  unintended effect of increasing costs to the federal government and

23  disrupting private finance markets.   See generally Willis-Proctor

24  Decl. Ex. 6 ("McNamar Report") at 8-10, 12-17.[1]  The purpose of the

25  ─────────────────
26  [1] In support of its motion to dismiss, FFB submitted the
    declaration of Cherisse Willis-Proctor, a records officer within
    the U.S. Department of Treasury who has supplied as exhibits
27  certified copies of various agreements relevant to the case.  ECF
    No. 7 ("Willis-Proctor Decl.").  Exhibit 6 contains a statement
    made to the House Ways and Means Committee on May 12, 1983 by
28  Deputy Secretary of the Treasury R.T. McNamar, in which Deputy

United States District Court
For the Northern District of California

FFB Act was "to assure coordination of these programs with the overall economic and fiscal policies of the Government, to reduce the cost of Federal and federally assisted borrowings from the public, and to assure that such borrowings are financed in a manner least disruptive of private financial markets and institutions." 12 U.S.C. § 2281.[2]  Congress established FFB as a "body corporate . . . subject to the general supervision and direction of the Secretary of the Treasury" and made it "an instrumentality of the United States Government."  12 U.S.C. § 2283.

Congress conferred on FFB a number of general powers.  Id. § 2289.  One of these is the power "to sue and be sued, complain, and defend, in its corporate name."  Id. § 2289(1).  Another is the power "to enter into contracts, to execute instruments to incur liabilities, and to do all things as are necessary or incidental to the proper management of its affairs and the proper conduct of its business."  Id. § 2289(9).  One of the functions of FFB is to purchase or sell any obligation issued, sold, or guaranteed by a federal agency.  Id. § 2285(a).  "Obligation" is a defined term that includes "any note, bond, debenture, or other evidence of indebtedness," with certain exceptions not relevant here.  Id. § 2282(2).  FFB often exercises its power to purchase obligations in order to serve as a lender for programs wherein a federal agency (for example, DOE) guarantees a loan to a private entity (for

---

Secretary McNamar explained, among other things, the background and purposes of FFB.

[2] See also Pealo v. Farmers Home Admin., 412 F. Supp. 561, 563 (D.D.C. 1976) rev'd 562 F.2d 744 (D.C. Cir. 1977) (Congress established FFB "to provide a source of funds for Federal agencies so as to lessen competition among the agencies in the private money market and to provide lower interest cost to the United States.").

United States District Court
For the Northern District of California

1   example, a builder of electrical infrastructure).  Generally, FFB

2   provides the financing by purchasing a note which the federal

3   agency then guarantees.[3]

4         **B.**   **The Solyndra Financing Arrangement**

5      The Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat.

6   594 (2005) ("Energy Policy Act"), codified at 42 U.S.C. § 16511 <u>et</u>

7   <u>seq.</u>, authorizes the Secretary of Energy ("Secretary") to guarantee

8   loans for certain eligible projects, and appropriates funds to

9   cover the costs of such guarantees.  <u>See</u> 42 U.S.C. §§ 16511-14.

10   When the Secretary guarantees 100 percent of a loan, the loan must

11   be funded by FFB (as opposed to a private bank).  <u>See</u> 10 C.F.R. §

12   609.10(d)(4)(i).

13      In September 2009, FFB and the Secretary entered into a

14   Program Financing Agreement that supplies the general framework for

15   this financing program.  <u>See</u> Willis-Proctor Decl. Ex. 1 ("PFA").

16   The financing process begins when the Secretary designates a

17   borrower.  <u>See</u> <u>id.</u> § 2.1.  The Secretary's formal designation of a

18   borrower places the Secretary and FFB under three separate

19   commitments: (a) FFB and the Secretary must sign "a Note Purchase

20   Agreement with the particular Borrower . . . setting forth the

21   terms and conditions under which FFB will purchase a Note issued by

22   such Borrower"; (b) the Secretary must guarantee the note pursuant

23   to the Energy Policy Act; and (c) FFB must purchase the note

24

25

26

27

28

---

[3] <u>E.g.</u>, <u>Californians for Renewable Energy v. U.S. Dept. of Energy</u>, CIV.A. 11-2128 JEB, 2012 WL 1744468, at *1 (D.D.C. May 17, 2012); <u>U.S. ex rel. Raynor v. Nat'l Rural Utils. Co-op Fin. Corp.</u>, 8:08CV48, 2011 WL 976482, at *2 (D. Neb. Mar. 15, 2011); <u>Great Plains Gasification Assocs. v. C.I.R.</u>, 92 T.C.M. (CCH) 534 (T.C. 2006); <u>Brazos Elec. Power Co-op, Inc. v. United States</u>, 49 Fed. Cl. 398, 400 (Fed. Cl. 2001); <u>Resolution Trust Corp. v. California</u>, 851 F. Supp. 1453, 1455 n.1 (C.D. Cal. 1994); <u>Mason Cnty. Med. Ass'n v. Knebel</u>, 563 F.2d 256, 260 (6th Cir. 1977).

**United States District Court**
For the Northern District of California

pursuant to the FFB Act.  <u>Id.</u> § 2.3.  Note Purchase Agreements signed by FFB and designated borrowers require the borrower to offer a promissory note to FFB, which FFB then buys, assuming certain preconditions are satisfied.  <u>Id.</u> §§ 1.1, 4.1.  One of those preconditions is the receipt by FFB of the Secretary's guarantee of the note in the event that a borrower defaults.

The PFA provides that the note shall be a future advance promissory note.  <u>Id.</u> § 1.1 (definition of "Note").  The amount of the note represents the maximum amount of financing that a borrower may receive under their particular PFA.  Form NPA § 7.3.4.[4]  The borrower receives the financing by requesting an advance on the note.  <u>Id.</u> § 7.2.  The borrower usually must specify a third party to receive the advance; in other words, FFB gives money to the borrower's creditors, not to the borrower itself.  <u>Id.</u> § 7.2(b).[5] The Secretary must approve each request before FFB will disburse the advanced funds.  <u>Id.</u> § 7.2(a).  Advances may be made "only at such time and in such amount as shall be necessary to meet the immediate payment or disbursing need of the Borrower."  <u>Id.</u>

On September 2, 2009, Solyndra, DOE, and FFB entered into a Note Purchase Agreement.  Willis-Proctor Decl. Ex. 2 ("Solyndra NPA").  Under the terms of the Solyndra NPA, Solyndra agreed to offer FFB a note in the amount of $535 million.  The Secretary guaranteed the note and FFB purchased it.  The terms of the

---

[4] The Willis-Proctor Declaration has several exhibits, the first of which is the PFA; the PFA, in turn, has several Annexes consisting of form examples of documents required by the PFA.  Annex 3 to the PFA is a form Note Purchase Agreement ("Form NPA").

[5] The PFA makes an exception for "[a]dvances to reimburse the Borrower for expenditures that it has made from its own working capital."  Form NPA § 7.2(b).

Solyndra NPA tracked the general terms set forth above.  That is, the Secretary guaranteed a $535 million note offered by Solyndra and purchased by FFB, against which note Solyndra could request advances of funds which, if approved by the Secretary, FFB would pay directly to Solyndra's creditors according to its "immediate payment or disbursing needs[s]," up to an aggregate maximum of $535 million and repayable with interest.

### C.   Plaintiff's Stop Notice

The Court takes this portion of its account from the allegations in Plaintiff's state court complaint and FFB's notice of removal.  ECF No. 1 (notice of removal ("NOR")) Ex. A ("Compl.").  Plaintiff is a California corporation and duly licensed contractor.  Compl. ¶ 1.  Plaintiff alleges that FFB acted as a "construction lender" to Solyndra with regard to construction of Solyndra's manufacturing facility at 47488 Kato Road, Fremont, California.  Id. ¶ 8.  Plaintiff "furnished labor, services, equipment and material for the installation of mechanical piping and components (HVAC, plumbing, process) for tool hookup . . . pursuant to written contract with Solyndra."  Id. ¶ 9.  Before its closure, Solyndra issued purchase orders to Plaintiff for work valued at $2,967,762.  Id.  Plaintiff allegedly completed $2,870,372 worth of work on those orders.  Id.  Plaintiff received partial payment on those purchase orders in the amount of $1,682,422, leaving an unpaid balance of $1,187,950, plus interest. Id. ¶ 10.  Solyndra suspended operations on August 31, 2011, while work on the Project was still ongoing.  Id. ¶ 11.  In January 2012,

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Plaintiff served FFB with a bonded stop notice.[6]  <u>Id.</u>, <u>id.</u> Ex. A

("Stop Not.").  FFB refused to set aside funds to satisfy the stop

notice.  <u>Id.</u> ¶ 17.

On or around February 28, 2012, Plaintiff sued FFB in Alameda

County Superior Court for enforcement of the bonded stop notice.

Compl. at 1 (state court case number RG12618947).  On March 13, the

United States Attorney's Office received copies of the state court

summons and complaint from the U.S. Department of Treasury.  NOR ¶

4.  On April 2, FFB removed the case from state court to this

Court, citing, inter alia, the federal-agency removal statute, 28

U.S.C. § 1442.[7]  NOR ¶ 5.  On April 23, FFB moved to dismiss the

---

[6] A stop notice is "a notice by one who has furnished materials or
labor for the construction of improvements, given to the owner of
the property, or to a lender of funds to be used for payment of
claims against such property, for the purpose of withholding money
in the hands of such owner or lender from the contractor so that
the materialman or laborer may be paid for his material or
services."  <u>See</u> Flintkote Co. v. Presley of N. California, 154 Cal.
App. 3d 458, 462 (Cal. Ct. App. 1984) (citing <u>Theisen v. Cnty. of
Los Angeles</u>, 54 Cal. 2d 170, 177-179 (Cal. 1960)); <u>see also</u> Miller
& Starr, 10 <u>Cal. Real Est.</u> § 28:78 (3d ed.) ("Miller & Starr").  A
bonded stop notice is a stop notice supported by a bond of 125
percent of the amount of the claim contained in the stop notice.
Miller & Starr, <u>supra</u>, § 28:84.  Generally, compliance with a
bonded stop notice is mandatory, while compliance with a non-bonded
stop notice is permissive.  <u>Manos v. Degen</u>, 203 Cal. App. 3d 1237,
1240 (Cal. Ct. App. 1988) (citing Cal. Civ. Code § 3162, <u>repealed
by</u> Stats. 2010, c. 697 (S.B. 189) § 16, operative July 1, 2012);
<u>see also</u> Cal. Civ. Code § 8536(b) (covering former § 3162).
Certain revisions to California's stop-notice laws took effect on
July 1, 2012, during the pendency of this motion.  The revisions
mainly restyled and renumbered the applicable sections of the
California Civil Code, and do not substantively change the law
applicable to this case.  <u>See</u> 44 <u>Cal. Jur. 3d</u> § 69 (section on
mechanics' liens and stop notices setting forth definitions which
apply under either pre- or post-revision code).
[7] A civil action . . . that is commenced in a State court
and that is against or directed to any of the following
may be removed by them to the district court of the
United States for the district and division embracing the
place wherein it is pending: [¶] The United States or any
agency thereof or any officer (or any person acting under
that officer) of the United States or of any agency
thereof, in an official or individual capacity, for or

**United States District Court**
For the Northern District of California

1   case and, on May 2, Plaintiff moved to remand the case back to

2   state court.   FFB's motion to dismiss argues that Plaintiff's claim

3   must fail for three reasons: (1) it is barred by the doctrine of

4   sovereign immunity, (2) it conflicts with and therefore is

5   preempted by federal law, and (3) in the alternative, treating the

6   motion as one for summary judgment, the evidence shows that FFB is

7   not a "construction lender" under California law and therefore is

8   not bound by Plaintiff's stop notice.   FFB stated none of these

9   defenses in its notice of removal.   <u>Compare</u> MTD <u>with</u> NOR.[8]

10

11   relating to any act under color of such office or on
     account of any right, title or authority claimed under
12   any Act of Congress for the apprehension or punishment of
     criminals or the collection of the revenue.
     28 U.S.C. § 1442(a)(1).

13

     [8] Here is the substantive portion of FFB's notice of removal:
14

15   1.   On February 28, 2012, [Plaintiff] filed a complaint to
          enforce bonded stop notice in Alameda County Superior
16        Court.   Plaintiff seeks $1,187,950.00 together with
          prejudgment interest.

17   2.   Plaintiff alleges that [Defendant] acted as a
          "construction lender," as that term is defined under
18        the California Civil Code, to Solyndra, a manufacturer
          of solar panel products, with regard to the
19        construction of a work of improvement known as the
          Solyndra solar manufacturing facility (the "Project").
          Plaintiff further alleges that [Defendant] was holder
20        of construction funds allocated to the Project.

21   3.   Plaintiff alleges that it furnished labor, services,
          equipment and material for the installation of
22        mechanical piping and components for tool hookup as
          part of the Project pursuant to written contract with
23        Solyndra.   Plaintiff claims Solyndra made partial
          payment for the work Plaintiff provided, but on August
24        31, 2011, Solyndra announced it was closing its
          business, and did so without paying Plaintiff all of
          the amounts due and unpaid.

25   4.   On March 13, 2012, the United States Attorney's Office
          received copies of the Alameda County Superior Court
26        summons and complaint from the U.S. Department of
          Treasury, which are attached as Exhibit A pursuant to
27        28 U.S.C. § 1446(a), and which constitute the only
          process or pleading which have been received.   We are
28        advised that an FFB employee received the summons and
          complaint via U.S. Mail on March 7, 2012.   The Summons

**United States District Court**
For the Northern District of California

III. **DISCUSSION**

A.   **Motion to Remand**

FFB removed this case from state to federal court on the basis of the federal-agency removal statute, 28 U.S.C. § 1442.[9]  See NOR ¶ 5.  While the general removal statute, § 1441, is strictly construed to favor remand, § 1442 is broadly construed to favor removal.  Durham, 445 F.3d at 1252-53.  This presumption furthers one of the key purposes of the statute: to provide federal defendants who have been haled into state court for acts done in the name of the federal government with an opportunity to have the validity of defenses based on federal law heard in a federal forum.  See Willingham v. Morgan, 395 U.S. 402, 406-07 (1969); see also Durham, 445 F.3d at 1252-53 (alluding to long history of federal agents "get[ting] into trouble when they act within the States --

---

and Complaint has not yet been served on the United States Attorney's Office as required by Rule 4(i)(1)(A(i)(ii), Fed. R. Civ. Proc.  No trial is scheduled on this case.

5.   This action must be removed to federal district court pursuant to 28 U.S.C. §§ 1442(a)(1) [sic] because it is a civil action against an agency and instrumentality of the United States Government.  This action may also be removed to federal district court pursuant to 28 U.S.C. § 1331 (civil actions arising under the Constitution, laws or treaties of the United States), and other applicable authorities.

[9] FFB's notice of removal also alludes to § 1331 (the federal-question original-jurisdiction statute) and unspecified "other applicable authorities."  NOR ¶ 5.  As FFB appears to concede, see MTR Opp'n at 5, these are insufficient grounds for removal.  Section 1331 pertains to original jurisdiction, not removal jurisdiction.  Nor does § 1331 provide a basis for removal under the general removal statute, § 1441, since Plaintiff's complaint sets forth only a state-law claim and does not raise a federal question.  Hence, because this Court could not have had original jurisdiction over Plaintiff's claim, FFB cannot remove under § 1441.  See, e.g., Regal Stone Ltd. v. Longs Drug Stores California, L.L.C., --- F. Supp. 2d ---, 2012 WL 685756, at *2 (N.D. Cal.).  As to the "other" authorities mentioned in FFB's removal notice, FFB has not identified them and the Court deems that ground abandoned.

**United States District Court**
For the Northern District of California

whether they're enforcing unpopular tariffs in South Carolina in the 1830s, killing recalcitrant moonshiners in self-defense in Tennessee in the 1880s, or exposing servicemen to asbestos to make military aircraft in the 1970s").  The Supreme Court has cautioned lower courts not to frustrate this purpose with "a narrow, grudging interpretation" of § 1442.  <u>Willingham</u>, 395 U.S. at 407.

Aided by this presumption, a federal defendant removing under § 1442 must demonstrate three things: "(a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions . . . and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'"  <u>Durham</u>, 445 F.3d at 1251.  Plaintiff does not challenge FFB on the first two criteria.[10]  <u>See</u> Reply at 3.  Neither does Plaintiff dispute that FFB can assert a colorable federal defense.  <u>See</u> <u>id.</u>  Indeed, it would be difficult to do so credibly, given that FFB has raised two colorable federal defenses in its motion to dismiss.  MTD at 7-10 (sovereign immunity), 10-13 (conflict preemption).  Rather, Plaintiff argues that remand is necessary because FFB failed to state the grounds of removal -- that is, it failed to articulate its federal defenses -- in the notice of removal itself.  Relying on the Supreme Court opinion

---

[10] The Court is satisfied that the first two <u>Durham</u> criteria are met.  FFB is a "person" within the meaning of § 1442.  <u>See</u> 12 U.S.C. § 2283 (FFB is a federal corporation); 1 U.S.C. § 1 (in statutes, the word "person" presumptively includes corporations); <u>Isaacson v. Dow Chem. Co.</u>, 517 F.3d 129, 135-36 (2d Cir. 2008) (nothing in § 1442 indicates intent to overcome presumption that person includes corporations).  There also is a "causal nexus" between FFB's acts and Plaintiff's claim: As FFB acknowledges, the Solyndra loan was "a perfect example of how Congress intended the FFB to work," MTD Reply at 12, and in taking the actions giving rise to Plaintiff's claim, FFB clearly acted under color of office.  <u>Durham</u> also requires that FFB have a colorable federal defense.  As explained more fully herein, FFB does have such defenses.  They are set forth in FFB's motion to dismiss.

<u>Mesa v. California</u>, 489 U.S. 121 (1989), Plaintiff argues that a federal defendant's failure to state its federal defenses in the notice of removal itself, as compared to some other paper, strips the federal court of the removal jurisdiction granted by § 1442. MTR Reply at 3-5.

This position misapprehends the holding of <u>Mesa</u>.  In that case, the government argued that a federal defendant seeking removal under § 1442 only needed to show that he had been summoned to court for an act done under color of office, regardless of whether the act gave rise to a federal defense.  <u>See</u> <u>Mesa</u>, 489 U.S. at 125, 134.  In other words, the government argued that federal defendants need not assert a federal defense to remove under § 1442.  The Supreme Court rejected this argument, observing that the government's view would "present grave constitutional problems." <u>Id.</u> at 137.  That is because a federal defendant could remove a case to federal court even if the case presented no controversy "arising under" federal law, as required by Article III, Section 2 of the Constitution.  <u>Id.</u> at 136-37.  The Court observed:

> Section 1442(a), in our view, is a pure jurisdictional statute, seeking to do nothing more than grant district court jurisdiction over cases in which a federal officer is a defendant.  Section 1442(a), therefore, cannot independently support Art. III "arising under" jurisdiction.  Rather, it is the raising of a federal question in the officer's removal petition that constitutes the federal law under which the action against the federal officer arises for Art. III purposes. The removal statute itself merely serves to overcome the "well-pleaded complaint" rule which would otherwise preclude removal even if a federal defense were alleged.

<u>Id.</u> at 136.  Plaintiff interprets this passage to mean that, unless the removal notice itself articulates a defense arising under federal law, a federal court cannot exercise jurisdiction under §

**United States District Court**
For the Northern District of California

1442.  MTR Reply at 4.  Plaintiff's view, though, confuses the
constitutional and statutory requirements for removal jurisdiction.

It is axiomatic that the judicial power of the United States
provided by Article III is broader than the jurisdiction actually
exercised by the federal courts, and that Congress may tailor that
jurisdiction by statute.  Verlinden B.V. v. Cent. Bank of Nigeria,
461 U.S. 480, 495 (1983); see also Mireles v. Wells Fargo Bank,
N.A., 845 F. Supp. 2d 1034, 1047 (C.D. Cal. 2012) (citing Libhart
v. Santa Monica Dairy Co., 592 F.2d 1062, 1064 (9th Cir. 1979))
("The right to remove a case to federal court is entirely a
creature of statute."); Hunter v. United Van Lines, 746 F.2d 635,
639 (9th Cir. 1984) ("Congress plainly has the power to confer
removal jurisdiction over cases in which only the defense is based
on federal law.").  Plaintiff reads Mesa as a case about the formal
or procedural -- that is, the statutory -- requirements of § 1442
removal.  But Mesa is a case about the constitutional requirements
of § 1442 removal.  It holds only that the Constitution requires
cases removed under § 1442 to present the federal court with a
controversy arising under federal law, but that, in a departure
from the usual, "well-pleaded complaint" rule, a defense may supply
the constitutionally requisite federal question.  This holding
simply does not address the question of where and how -- i.e., in
which paper -- the defense must appear.

That Mesa does not address this question is no surprise, for
although the Mesa Court focused on § 1442, it is § 1446 that
governs the form of the removal notice.  See Ely Valley Mines, Inc.
v. Hartford Acc. & Indem. Co., 644 F.2d 1310, 1315 (9th Cir. 1981)
(applying procedural requirements of § 1446 where right to remove

**United States District Court**
For the Northern District of California

1    was provided by § 1442).  <u>Durham</u> suggests that the same presumption

2    in favor of removal that applies to § 1442 applies with equal force

3    to § 1446.  <u>See</u> 445 F.3d at 1253 (extending pro-removal presumption

4    to § 1446 "where the timeliness of a federal officer's removal is

5    at issue").  Whether it does or not, § 1446 requires a party

6    seeking removal to include nothing more than a "short and plain

7    statement of the grounds for removal."  28 U.S.C. § 1446(a).

8        Unfortunately, while FFB's notice of removal does include a

9    "short and plain statement," what it states is not actually the

10   "grounds for removal."  The removal notice merely recites, in

11   relevant part: "This action must be removed to federal district

12   court pursuant to 28 U.S.C. [§] 1442(a)(1) because it is a civil

13   action against an agency and instrumentality of the United States

14   Government."  NOR ¶ 5.  This statement is inadequate because it

15   does not supply facts that would permit Plaintiff or the Court to

16   determine that <u>Durham</u>'s three-pronged test for federal-agency

17   removal had been met, the relevant facts being the agency's

18   "personhood" under the statute, the required causal nexus, and the

19   agency's federal defenses.  445 F.3d at 1251.

20       Nevertheless, the defect in the removal notice is merely a

21   defect of form that does not strip this Court of jurisdiction.

22   Given that FFB clearly can assert some colorable federal defense,

23   the Court is not inclined to frustrate the Congressional purpose of

24   the federal-agency removal statute with a "grudging, narrow" ruling

25   that would remand this action to state court and thereby deprive

26   FFB of the opportunity to test its federal defenses in a federal

27   forum.  The appropriate course of action is for the Court to retain

28   jurisdiction but require FFB to comply with § 1446 by amending its

**United States District Court**
For the Northern District of California

notice of removal to state the <u>actual</u> grounds for removal

jurisdiction.[11]  Frankly, the Court is perplexed as to why the U.S.

Attorney did not state them in the first place.  The government

cannot expect simply to wave toward § 1442 and then waltz into

federal court without making any showing that would allow a

plaintiff (or a district judge) to determine that removal was

proper.  See <u>Gaus v. Miles, Inc.</u>, 980 F.2d 564, 567 (9th Cir. 1992)

(rejecting removal notice where defendant baldly concluded that

jurisdictional requirements were satisfied, "as if attempting to

recite some 'magical incantation'"); <u>Sparta Surgical Corp. v. Nat'l</u>

<u>Ass'n of Sec. Dealers, Inc.</u>, 159 F.3d 1209, 1213 (9th Cir. 1998)

(directing district courts to test propriety of removal on basis of

the record extant "at the time of removal").[12]  Perhaps aware of

this, FFB appears to seek leave to amend its notice of removal in

the event that the Court finds it technically deficient.  See MTR

Opp'n at 6.

---

[11] <u>Cf. Russell v. U.S. Department of Housing & Urban Development</u>, 214 F. Supp. 2d 933 (W.D. Ark. 2002).  In that case, a federal defendant removed to federal court, stating in its notice of removal only that the case was "an action for specific performance against an agency of the United States of America, and [was] thus removable by the United States under [§ 1442]."  <u>Id.</u> at 934.  The plaintiffs moved for remand on the ground that "their complaint does not allege a federal claim and the removal notice does not allege adequate grounds for removal under section 1442(a)(1) because it fails to allege a colorable federal defense."  <u>Id.</u>  The district court inquired whether it was "apparent from the removal notice that [the federal agency] ha[d] a federal defense to the complaint."  <u>Id.</u>  The court found that the removal notice was "deficient in this respect," but retained jurisdiction regardless, since the federal agency had "filed an amended notice of removal" that set forth the specific defense it was raising.  <u>Id.</u>

[12] The removal statutes themselves clearly evince Congressional concern about this sort of rote removal.  See 28 U.S.C. §§ 1446(a) (reminding attorneys that removal notices are subject to Rule 11), 1447(c) (authorizing courts ordering remand to require defendants to pay the "just costs and any actual expenses, including attorney fees, incurred as a result of the removal").

**United States District Court**
For the Northern District of California

1    Plaintiff argues that FFB should not be allowed to amend its

2   removal notice because the thirty-day period for removal provided

3   by § 1446(b) has long since elapsed.  MTR Reply at 6-8.  Plaintiff

4   is wrong.  First, the cases cited by Plaintiff stand only for the

5   uncontroversial proposition that, once the thirty-day period

6   elapses, a defendant is not permitted to amend the notice of

7   removal to add a "separate basis" for removal jurisdiction -- that

8   is, to state an entirely new reason.  <u>ARCO Envtl. Remediation,</u>

9   <u>L.L.C. v. Dep't of Health & Envtl. Quality of Montana</u>, 213 F.3d

10   1108, 1117 (9th Cir. 2000); <u>see also</u> <u>Sonoma Falls Developers, LLC</u>

11   <u>v. Nevada Gold & Casinos, Inc.</u>, 272 F. Supp. 2d 919, 926 (N.D. Cal.

12   2003).  That is not what FFB seeks leave to do here.  The notice of

13   removal set forth the legal basis for removal, § 1442, as well as

14   facts which purport to justify removal on that ground, namely, the

15   fact that FFB is "an agency and instrumentality of the United

16   States Government."  NOR ¶ 5.  As explained above, that fact alone

17   is not enough to support removal, and FFB's notice of removal

18   should have supplied facts addressing the jurisdictional

19   requirements enunciated in <u>Durham</u>.  Nevertheless, amendment at this

20   point would not add a separate basis for jurisdiction; it would

21   merely clarify the factual underpinnings of the previously asserted

22   basis.  As the cases cited by Plaintiff recognize, that is

23   permissible.  <u>E.g.</u>, <u>ARCO</u>, 213 F.3d at 1117.

24    Nothing in <u>Bays</u> is inconsistent with this conclusion, contrary

25   to Plaintiff's interpretation of that case.  MTR Reply at 7-8

26   (citing <u>Bays v. Spectrum Sec. Servs.</u>, Case No. CV 10-04362 DDP

27   (MANx), 2010 U.S. Dist. LEXIS 112057 (C.D. Cal. Oct. 7, 2010)).  In

28   <u>Bays</u>, the district court specifically found that the defendant

1    "ha[d] not demonstrated that it ha[d] a colorable federal defense .

2    . . . ."  2010 U.S. Dist. LEXIS 112057, at *4.  As such, the

3    defendant could not satisfy the jurisdictional requirements of

4    Article III.  See Mesa, 489 U.S. at 136-37.  In this case, however,

5    FFB has established that it has such defenses, so Bays is

6    inapposite.

7         In summary, the Court concludes that it has removal

8    jurisdiction over this case because FFB can assert colorable

9    federal defenses and the Court is otherwise satisfied that FFB

10   meets the criteria for removal under § 1442.  Supra note 10.  The

11   deficiencies in the notice of removal are merely technical and

12   hence amendable at any time.  The Court therefore DENIES

13   Plaintiff's motion to remand.  Consequently, Plaintiff's request

14   for an award of removal-related attorney fees, MTR at 15, is

15   DENIED.

16        Though the Court retains jurisdiction over this matter, FFB

17   still must comply with the formal requirements of § 1446.

18   Therefore, the Court ORDERS FFB to file, within seven (7) days of

19   the signature date of this Order, an amended notice of removal that

20   sets forth the grounds of removal consistent with § 1446, Durham,

21   and the guidance herein.

22   ///

23        **B.**   **Motion to Dismiss**

24        FFB moves to dismiss Plaintiff's complaint under Rule 12(b)(1)

25   or, in the alternative, to enter summary judgment in its favor.

26   FFB marshals three arguments toward these ends.  First, FFB

27   contends that, because it is an instrumentality of the U.S.

28   government, sovereign immunity shields it from Plaintiff's state-

**United States District Court**
For the Northern District of California

law claim for enforcement of the bonded stop notice.  Second, FFB argues that, as applied in the circumstances of this case, California's stop-notice law conflicts with and therefore is preempted by the FFB Act and the Energy Policy Act.  Finally, in the event that the Court does not dismiss the case under Rule 12(b)(1), FFB asks the Court to treat its motion as one for summary judgment and find that FFB is not a "construction lender," as California's stop-notice law defines that term.  The Court addresses each argument in turn.

### 1.   Sovereign Immunity

#### a.   Legal Standard

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."  F.D.I.C. v. Meyer, 510 U.S. 471, 475 (1994).  "Sovereign immunity is jurisdictional in nature.  Indeed, the terms of the United States' consent to be sued in any court define that court's jurisdiction to entertain the suit."  Id. (internal quotation marks and brackets omitted); see also Tobar v. United States, 639 F.3d 1191, 1195 (9th Cir. 2011) ("The waiver of sovereign immunity is a prerequisite to federal-court jurisdiction.").  Though defendant FFB is the party who has moved to dismiss this case, Plaintiff is the one who bears the burden of establishing that FFB lacks sovereign immunity and hence that federal jurisdiction is proper, notwithstanding Plaintiff's attempts to remand the case.  See Levin v. United States, 663 F.3d 1059, 1063 (9th Cir. 2011) (plaintiff bears burden of establishing waiver of sovereign immunity); DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 342 n.3 (2006) (burden of establishing federal jurisdiction is borne by the party asserting it at the time it is

United States District Court
For the Northern District of California

1    challenged, regardless of previous positions vis-à-vis removal).

2         The Supreme Court has set forth a two-step inquiry for

3    determining whether sovereign immunity shields a government agency

4    from a particular claim.  Meyer, 510 U.S. at 484; U.S. Postal Serv.

5    v. Flamingo Indus. (USA) Ltd., 540 U.S. 736, 743 (2004).  In the

6    first step, the Court must ask whether Congress has waived the

7    government agency's sovereign immunity.  Meyer, 510 U.S. at 484;

8    Flamingo Indus., 540 U.S. at 743.  If it has, the Court asks the

9    second question, which is "whether the source of substantive law

10   upon which the claimant relies provides an avenue for relief."

11   Meyer, 510 U.S. at 484; see also Flamingo Indus., 540 U.S. at 743

12   (using Meyer test).

13        Meyer and Flamingo Industries stand for the idea that a waiver

14   of sovereign immunity is a necessary but not sufficient condition

15   for imposing liability on a federal defendant.  The waiver makes

16   liability possible, but only if the underlying claim is one that

17   can reach the federal defendant.  In Meyer, the predecessor to the

18   FDIC, the Federal Savings and Loan Insurance Corporation ("FSLIC"),

19   fired one of its employees.  The former employee brought a Bivens[13]

20   action on the theory that FSLIC had "deprived him of a property

21   right (his right to continued employment under California law)

22   without due process of law in violation of the Fifth Amendment."

23   510 U.S. at 474.  The Supreme Court held that no Bivens action

24   could lie against the FSLIC despite the agency's ability to "sue

25   and be sued."  Id. at 483-84.  The Court reasoned that the source

27   [13] In Bivens v. Six Unknown Named Agents of Fed. Bureau of
     Narcotics, 403 U.S. 388 (1971), the Supreme Court inferred the
28   existence of "a cause of action for damages against federal agents
     who allegedly violated the Constitution."  Meyer, 510 U.S. at 473.

**United States District Court**
For the Northern District of California

of substantive law underlying the plaintiff's claim -- the Court's own earlier decision in <u>Bivens</u> -- provided a cause of action against government <u>agents</u>, but not government <u>agencies</u> like FSLIC. <u>Id.</u> at 483-486.

Similarly, in <u>Flamingo Industries</u>, a company that had been supplying mail sacks to the United States Postal Service ("USPS") sued USPS for antitrust violations after USPS terminated its contract.  540 U.S. at 738.  Noting that Congress had authorized USPS to "sue and be sued," a unanimous Supreme Court concluded that the plaintiff nevertheless could not assert an antitrust claim against USPS because the source of substantive law in that case -- the Sherman Act -- only provided a cause of action against "persons," as defined by the statute.  <u>Id.</u> at 744-45.  The Court held that USPS, as part of the executive branch of the federal government, was not a "person" within the meaning of the Sherman Act, and therefore the Sherman Act simply did not provide an avenue for relief against USPS, notwithstanding its lack of sovereign immunity.  <u>Id.</u> at 745-47.

Thus, the two-step <u>Meyer</u> test obligates courts to inquire not only whether Congress waived a federal defendant's sovereign immunity, but also whether the plaintiff's claim can reach the federal defendant, notwithstanding its lack of immunity.  The first question asks, in essence, whether the government has put down its shield; the second, whether plaintiff has been given a sword.[14]

_____

[14] This second question is often framed as one of Congressional intent, even though in <u>Meyer</u> the lawmaking body in question was actually the <u>Bivens</u> Court.  <u>E.g.</u>, <u>id.</u> at 744; <u>Currier v. Potter</u>, 379 F.3d 716, 724-26 (9th Cir. 2004); <u>Anselma Crossing, L.P. v. U.S. Postal Serv.</u>, 637 F.3d 238, 242 n.6 (3d Cir. 2011); <u>MB Fin. Group, Inc. v. U.S. Postal Serv.</u>, 545 F.3d 814, 820 (9th Cir. 2008) (Tallman, J., dissenting).  <u>Meyer</u> therefore suggests that the

**United States District Court**
For the Northern District of California

1        b.   Analysis

2    As noted previously, the question of whether California's

3    stop-notice laws reach FFB appears to be one of first impression.

4    Proceeding to the first step in the Meyer analysis, the Court

5    agrees with the parties that Congress waived FFB's sovereign

6    immunity by giving FFB the power to "sue and be sued."  12 U.S.C. §

7    2289; MTD at 7, MTD Opp'n at 10-11.  "[S]uch sue-and-be-sued

8    waivers are to be liberally construed, notwithstanding the general

9    rule that waivers of sovereign immunity are to be read narrowly in

10   favor of the sovereign."  Meyer, 510 U.S. at 480 (internal

11   quotation marks and citations omitted).  "It must be presumed that

12   when Congress launched a governmental agency into the commercial

13   world and endowed it with authority to 'sue or be sued,' that

14   agency is not less amenable to judicial process than a private

15   enterprise under like circumstances would be."  Flamingo Indus.,

16   540 U.S. at 742 (quoting Fed. Hous. Admin., Region No. 4 v. Burr,

17   309 U.S. 242, 245 (1940)) (brackets omitted); see also Meyer, 510

18   U.S. at 482-83 (a government entity authorized to "sue and be sued"

19   is subject to no less liability than a private corporation).

20   Hence, "agencies authorized to 'sue and be sued' are presumed to

21   have fully waived immunity."  Meyer, 510 U.S. at 481 (internal

22   quotation marks omitted).[15]  Because Congress authorized FFB to sue

23   ─────────────────────────────────

"avenue of relief" analysis does not turn on what the United States
24   Congress intended; rather, it turns on whether the substantive body
of law gives plaintiff a claim upon which relief can be granted,
25   regardless of whether Congress is the source of the substantive
body of law.  This distinction, though admittedly fine, matters:
26   Framing the matter as one of Congressional intent implies that only
Congress can provide an "avenue of relief," which, in a case such
27   as this one where a plaintiff appeals to state law for relief,
unhelpfully suggests the existence of a federalism issue which is
28   not actually present.
[15] The government overcomes this presumption only if it makes a

United States District Court
For the Northern District of California

1   and be sued, the Court holds that Congress fully waived FFB's

2   sovereign immunity and, accordingly, proceeds to the second step of

3   the <u>Meyer</u> analysis.

4        In that step, the Court must determine whether the substantive

5   law upon which Plaintiff relies, California's stop-notice law,

6   provides Plaintiff with an "avenue for relief" against FFB.  <u>Meyer</u>,

7   510 U.S. at 484.  Accordingly, the Court "look[s] to the statute."

8   <u>Flamingo Indus.</u>, 540 U.S. at 744.  The Court concludes that

9   California's stop-notice laws do provide Plaintiff with an avenue

10  for relief from FFB.  Unlike the <u>Bivens</u> action asserted in <u>Meyer</u>

11  and the antitrust claim in <u>Flamingo Industries</u>, nothing in

12  California's stop-notice law is inconsistent with enforcement

13  against the federal government, or, more specifically, against an

14  instrumentality of the federal government that has been stripped of

15  its immunity and launched into the commercial world.

16       Before turning to the statutory text, the Court observes that

17  California's stop-notice laws are part of "an integrated scheme

18  obviously designed to provide maximum protection to laborers and

19  materialmen."  <u>Mech. Wholesale Corp. v. Fuji Bank, Ltd.</u>, 42 Cal.

20  App. 4th 1647, 1656 (Cal. Ct. App. 1996).  This scheme is

21  "remedial" in nature and intended to be "liberally construed."

22  _____

23          clear showing that certain types of suits are not
            consistent with the statutory or constitutional scheme,
24          that an implied restriction of the general authority [to
            sue and be sued] is necessary to avoid grave interference
25          with the performance of a governmental function, or that
            for other reasons it was plainly the purpose of Congress
26          to use the "sue and be sued" clause in a narrow sense.

27  <u>Meyer</u>, 510 U.S. at 480 (quoting <u>Fed. Hous. Admin., Region No. 4 v.</u>

28  <u>Burr</u>, 309 U.S. 242, 245 (1940)).  FFB has not attempted to make
    such a showing here.

**United States District Court**
For the Northern District of California

1  <u>Connolly Dev., Inc. v. Sup. Ct.</u>, 17 Cal. 3d 803, 826-27 (1976).

2  Laborers and materialmen may assert the stop-notice remedy against

3  either (1) the owner of the work of an improvement or (2) the

4  project's "construction lender."  <u>Id.</u> at 809.  Plaintiff's theory

5  is that FFB was a "construction lender" for purposes of the

6  Solyndra project.

7       "Construction lender" means [1] any mortgagee or
        beneficiary under a deed of trust lending funds with
8       which the cost of the work of improvement is, wholly or
        in part, to be defrayed, or any assignee or successor in
9       interest of either, or [2] any escrow holder or other
        party holding any funds furnished or to be furnished by
10      the owner or lender or any other person as a fund from
        which to pay construction costs.

11  Cal. Civ. Code § 3087 (brackets added).[16]

12      Plaintiff argues that FFB falls within the second portion of

13  the definition, which applies to any party who holds any "fund from

14  which to pay construction costs."  MTD Opp'n at 11-12.  In essence,

15  Plaintiff maintains that because FFB held funds for Solyndra that

16  were used for construction, FFB is a construction lender and hence

17  subject to Plaintiff's stop notice.  The Court agrees.

18      FFB does not dispute that it was a lender, as that term is

19  commonly understood.  Indeed, it would be difficult to do so

20  because FFB held a note from Solyndra in which Solyndra agreed to

21  repay FFB the monies advanced.  FFB's argument turns, rather, on

22  the notion that it did not "hold" funds.  According to FFB,

23  California's "stop notice law was intended to apply to a lender who

24  has loaned a sum certain, but who retains the proceeds as security

25

26  [16] As discussed in note 6, effective July 1, 2012, the California
    legislature restyled, reorganized, and renumbered the stop-notice
27  laws.  The statutory definition of the term "construction lender,"
    formerly set forth at section 3087, is now set forth at section
28  8006, where it has been reorganized into subsections as suggested
    by the brackets added herein, but remains substantively the same.

23

**United States District Court**
For the Northern District of California

or in loan fund accounts." MTD at 9.  In contradistinction to such a lender, FFB characterizes itself as merely having "purchased a promissory note that was 100% guaranteed by the Secretary of Energy" and "advanced funds only after (1) a request was made by the borrower, and (2) the request was approved by the Secretary of Energy." Id.  FFB emphasizes that it exercised no discretion over whether to approve advances requested by Solyndra; that discretion resided exclusively with the Secretary.  FFB asserts that "[t]here are no undrawn funds sitting in an account at FFB in Solyndra's name," the implication being that there are no funds for Plaintiff to attach.

While FFB offers a number of formal distinctions between itself and a typical, private lender, FFB never establishes how these distinctions amount to a difference.  What transpired here, stripped of its labels, is that a bank made a loan to a borrower to fund a construction project.  Instead of the usual deed of trust, the bank accepted as security the guarantee of the federal government in the person of the Secretary of Energy.  Though the Secretary oversaw whether, when, and to whom the monies would be disbursed, FFB actually disbursed the funds.  FFB did so pursuant to a contractual arrangement with Solyndra which committed a maximum amount of money to Solyndra which Solyndra could, and did, use to pay construction costs.  In short, Solyndra's right to use money to pay construction costs constituted the "construction fund."  The fact that Solyndra had the right to use funds provided by FFB is what made FFB the "construction lender."

FFB argues that the stop-notice laws can reach only private banks or like entities who lend a "sum certain" which then resides

in a dedicated account.  MTD at 9, 10.  First, that is not true.
The statutory definition of "construction lender" applies by its
plain language to a variety of parties, such as escrows and
unidentified "other" parties.  At least one California treatise
notes that even fire or earthquake insurance carriers may be deemed
"construction lenders" under the statute.  Cal. Constr. L. Manual §
6:110 (6th ed.).  The definition is simply more expansive than FFB
would have it.  Second, assuming that FFB's definition were correct
and the stop-notice laws contemplated only the lenders of a sum
certain who held funds in a dedicated account, it is not clear on
the record before the Court that what transpired in this case is
meaningfully different from that: A bank, albeit a federal one,
made a loan to a borrower to fund a construction project.  Third,
FFB's position would make the efficacy of California's stop-notice
laws depend on the picayune matter of which label is affixed to an
account.  That result is inconsistent with the California cases
that counsel a liberal construction of the stop-notice laws to
effect their remedial purpose, that remedial purpose being the
vindication of rights to payment held by laborers and materialmen.
It also is inconsistent with the statutory definition of a
"construction lender," which describes construction funds in a
functional way: They are, simply, "funds furnished or to be
furnished . . . as a fund from which to pay construction costs."
Cal. Civ. Code § 3087 (superseded July 1, 2012).  The law says
nothing about who must furnish the funds, to whom, or in what
manner.  The restyled version of the statutory definition makes its
functional nature even more plain: It states that the term
"construction lender" encompasses persons providing funds "with

which the cost of all or part of a work of improvement is to be paid." Id. § 8006.  This definition is functional, flexible, and, with respect to the Solyndra loan, applicable to FFB.

Considering FFB in light of its being subject to no less liability than a private corporation, Meyer, 510 U.S. at 482-83, the Court sees A-1 Door as analogous to this case.  A-1 Door & Materials Co. v. Fresno Guarantee Sav. & Loan Ass'n, 61 Cal. 2d 728 (Cal. 1964).  In that case, a defendant savings and loan association ("S&L") made a loan to the owners of unimproved real property so that the owners could build on the land.  Id. at 731. The owners executed promissory notes and then assigned the loan proceeds to the S&L, who agreed to disburse them in installments as the project went along.  Id.  Construction halted on the project and the S&L retained the loan proceeds.  Id.  Unpaid materialmen issued a stop notice and then sued the S&L for enforcement.  Id. The California Supreme Court, in holding that the S&L could not use unexpended loan proceeds to reduce the amount of the owners' indebtedness or to complete construction, described the creation of a construction fund.  It said that a construction fund was created when the S&L "lent specified amounts to the owners for construction purposes, and the owners executed promissory notes for, and agreed to pay interest on, the full amount of each loan." Id. at 734-35. That is essentially what happened here, though FFB paid the money to Solyndra's creditors rather than directly to Solyndra itself. FFB's insistence to the contrary merely quibbles on the meaning of the phrase "construction fund."  To agree with FFB in light of A-1 Door, the Court would have to find that FFB's loan was not one "for construction purposes."  No party has asked the Court to find that

**United States District Court**
For the Northern District of California

1    fact.  Accordingly, the Court rejects FFB's contention that it did

2    not make a construction loan to Solyndra and, hence, that it did

3    not serve as a construction lender within the meaning of

4    California's stop-notice laws.

5         FFB's other arguments are also unavailing.  FFB cites Marcus

6    Garvey Square for the proposition that the existence of sovereign

7    immunity is determined by the practical test of whether a judgment

8    must be satisfied from the United States Treasury.  MTD at 10; MTD

9    Reply at 4-5 (citing Marcus Garvey Square, Inc. v. Winston Burnett

10   Construction Co. of California, Inc., 595 F.2d 1126, 1132 (9th Cir.

11   1979)).  The first problem with that position is that, if Marcus

12   Garvey Square actually meant what FFB suggests it does, it would be

13   in obvious conflict with the later-decided cases Meyer and Flamingo

14   Industries, since it would supplant their two-step analysis with

15   the single question of whether the judgment sought by the plaintiff

16   would be satisfied from the U.S. Treasury.  The second problem is

17   that Marcus Garvey Square does not mean that.  It speaks only to

18   the question of whether the United States' sovereign immunity is

19   waived by a statute authorizing an agency head to sue and be sued,

20   when the United States rather than the agency head is the real

21   party in interest.  Those are not the facts of this case; FFB has

22   been sued in its own name and Plaintiff does not seek to reach past

23   FFB to the United States itself.  The third problem is that, if

24   sovereign immunity barred any attempt to secure a judgment against

25   a federal defendant that would be paid from the U.S. Treasury, it

26   is unclear how Congress ever could waive it.

27        FFB also suggests that the California state legislature lacks

28   the authority to "give[] a contractor the right to recover from the

United States District Court
For the Northern District of California

United States Treasury."  MTD at 10; MTD Reply at 4, 5.  To the extent that FFB is suggesting that California cannot waive the federal government's sovereign immunity, FFB is correct.  But the suggestion misses the point.  As the Court discussed during the first step of the Meyer analysis, the California state legislature did not waive FFB's sovereign immunity.  Congress did.  And when Congress did so, it subjected FFB to liability in the manner of a private corporation.  Private corporations are subject to stop notices under California law.  Accordingly, so is FFB.

FFB suggests in passing that it cannot be subjected to a stop notice because it has and had no contractual relationship with Plaintiff.  MTD Reply at 4.  But the very nature of a stop notice is to supply laborers and materialmen with a remedy despite their lack of contractual relationship with the construction lender. E.g., Connolly, 17 Cal. 3d at 809 ("Failure of the owner or lender to withhold money as required by the [stop] notice may render him personally liable to the claimant, notwithstanding the absence of privity of contract."); Mech. Wholesale Corp. v. Fuji Bank, Ltd., 42 Cal. App. 4th 1647, 1659 (Cal. Ct. App. 1996) (The stop-notice remedy "is a liability which exists in the absence of any contractual privity whatsoever.").  The lack of a contract between FFB and Plaintiff presents no bar to the relief Plaintiff seeks.

The root of FFB's objection to Plaintiff's stop notice appears to be that FFB is a government bank rather than a private bank and "simply does not work the way a private bank does."  MTD Reply at 7; MTD at 9.  But whether FFB "works" like a private bank in all of its particulars is not the question here.  The question is whether FFB acted as a construction lender under California's stop-notice

laws.   The Court concludes that it did.   When Congress launched FFB

into the commercial world to serve as a lender for, among other

things, construction projects, it waived FFB's sovereign immunity

and hence subjected FFB to at least as much potential liability as

a private corporation.   See <u>Flamingo Indus.</u>, 540 U.S. at 742;

<u>Meyer</u>, 510 U.S. at 482-83.   FFB cannot now escape liability solely

by virtue of its status as a federal entity.   Congress foreclosed

that defense when it allowed FFB to sue and be sued.   The only

remaining question, then, is whether a California stop notice can

reach an entity that loans money for a construction project, as FFB

did.   It can.

Because (1) Congress fully waived FFB's sovereign immunity and

(2) California's stop-notice law provides Plaintiff with an avenue

for relief from a construction lender such as FFB, FFB's Rule

12(b)(1) motion to dismiss this action on sovereign immunity

grounds is DENIED.

### 2.   Conflict Preemption

#### a.   <u>Legal Standard</u>

FFB argues that Plaintiff's claim for enforcement of its stop

notice must be dismissed because enforcement would conflict with,

and therefore is preempted by, the FFB Act and the Energy Policy

Act.   Under the Supremacy Clause of the U.S. Constitution,[17]

---

[17]   This Constitution, and the Laws of the United States
which shall be made in Pursuance thereof; and all
Treaties made, or which shall be made, under the
Authority of the United States, shall be the supreme Law
of the Land; and the Judges in every State shall be bound
thereby, any Thing in the Constitution or Laws of any
State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2.

**United States District Court**
For the Northern District of California

1   Congress has the power to preempt state law.  Crosby v. Nat'l

2   Foreign Trade Council, 530 U.S. 363, 372 (2000).  Courts usually

3   think of preemption as coming in three kinds: express, field, and

4   conflict.[18]  See id.; Kroske v. U.S. Bank Corp., 432 F.3d 976, 981

5   (9th Cir. 2005).  FFB invokes only the third kind, conflict

6   preemption.

7        "[S]tate law is preempted by federal law to the extent that it

8   actually conflicts with federal law." Ctr. for Bio-Ethical Reform,

9   Inc. v. City & Cnty. of Honolulu, 455 F.3d 910, 917 (9th Cir. 2006)

10  (quoting Pac. Gas & Elec. Co. v. State Energy Res. Conservation &

11  Dev. Comm'n, 461 U.S. 190, 204 (1983)).  A state law conflicts and

12  is thus preempted "where [1] it is impossible for a private party

13  to comply with both state and federal requirements, or where [2]

14  state law stands as an obstacle to the accomplishment and execution

15  of the full purposes and objectives of Congress." Kroske, 432 F.3d

16  at 981 (quoting English, 496 U.S. at 79) (brackets added).

17  Additionally, courts must assume that "the historic police powers

18  of the States" are not preempted "unless that [is] the clear and

19  manifest purpose of Congress."  Id.  "The presumption of non-

20  preemption does not apply, however, when the State regulates in an

21  area where there has been a history of significant federal

22  presence."  Id. (internal quotation marks omitted).

23              b.    Analysis

24

25

26  [18] These three categories are not "rigidly distinct.  Indeed, field
    pre-emption may be understood as a species of conflict pre-emption:
27  A state law that falls within a pre-empted field conflicts with
    Congress' intent (either express or plainly implied) to exclude
28  state regulation." English v. Gen. Elec. Co., 496 U.S. 72, 79 n.5
    (1990).

**United States District Court**
For the Northern District of California

1    The Court begins by observing that California's stop-notice

2 law lies squarely within an area traditionally regulated by the

3 states pursuant to their historic police powers -- construction law

4 generally and specifically the remedial scheme protecting

5 construction contractors' rights to payment on contracts.  The

6 stop-notice remedy at issue here is a creature entirely of

7 California statute.  Mech. Wholesale Corp., 42 Cal. App. 4th at

8 1657-58.  Neither party argues that there has been a "history of

9 significant federal presence" in the area of California's

10 mechanics' lien and stop-notice laws, nor is the Court aware of any

11 such presence.  Neither do the parties point to any clear or

12 manifest signal that Congress passed the FFB Act or Energy Policy

13 Act with the intent of preempting California's stop-notice law.

14 The Court proceeds, therefore, from the assumption that Congress

15 did not intend to preempt California's stop-notice laws.  This

16 presumption means FFB bears the burden of showing Congressional

17 intent to preempt state law.  See Chamberlan v. Ford Motor Co., 314

18 F. Supp. 2d 953, 962 (N.D. Cal. 2004).

19    FFB does not argue that compliance with both federal law and

20 California's stop-notice law would be impossible in this case.  See

21 Kroske, 432 F.3d at 981.  Rather, it argues that the stop-notice

22 remedy sought by Plaintiff would present "an obstacle to the

23 accomplishment and execution of the full purposes and objectives of

24 Congress," id., specifically, to Congress's purposes and objectives

25 for the Energy Policy Act and the FFB Act.  MTD at 11-13, MTD Reply

26 at 7-9.  The argument is unavailing.

27    With respect to the Energy Policy Act, FFB simply fails to

28 identify any statutory purpose or objective with which enforcement

1   of a stop notice would conflict.  This is unsurprising: The Energy

2   Policy Act provides a mechanism for providing federally-backed

3   loans to the makers of innovative energy technologies, and it is

4   difficult to envision how enforcement of a construction

5   contractor's stop notice could impede this scheme.  But regardless

6   of whether such an impediment could be envisioned, FFB bears the

7   burden of showing that California's stop-notice law presents an

8   obstacle to Congress's objectives for the Energy Policy Act and, by

9   failing to address those objectives with any specificity, it fails

10  to carry its burden.

11      With respect to the FFB Act, FFB cites Congress's statement

12  that its purpose in passing the FFB Act was "[1] to assure

13  coordination of [federally assisted borrowing] programs with the

14  overall economic and fiscal policies of the Government, [2] to

15  reduce the cost of Federal and federally assisted borrowings from

16  the public, and [3] to assure that such borrowings are financed in

17  a manner least disruptive of private financial markets and

18  institutions."  12 U.S.C. § 2281 (brackets added).  FFB focuses its

19  conflict-preemption argument on the second aspect of Congress's

20  purpose, the reduction of costs borne by the public in financing

21  federal borrowing programs like the one in which Solyndra

22  participated.[19]  MTD at 12; MTD Reply at 9.  FFB argues that

23  requiring FFB to make good on Plaintiff's stop notice would

24  undermine its ability to limit the cost of federally-backed

25  _____

26  [19] FFB makes glancing reference to Congress's stated object of
    coordination of federal borrowing programs, MTD Reply at 8, but

27  never explains how enforcement of a stop notice would or even could
    impede the ability of the federal government to "coordinate" the

28  interactions of federal agencies with the private lending market.

**United States District Court**
For the Northern District of California

1  borrowing programs.  Id.  This argument fails because it proves too

2  much.  FFB's position, if accepted, would mean that any state law

3  whose enforcement resulted in increased costs for FFB would be

4  conflict-preempted.  That cannot possibly have been Congress's

5  intent.  A federal agency's diffuse, undifferentiated interest in

6  reducing costs cannot be enough to preempt state law in the face of

7  the presumption against preemption that applies in areas of

8  traditional state regulation.[20]  Neither can FFB's argument be

9  squared with Congress's express authorization for FFB to purchase

10 and be sued on obligations like the promissory note it purchased

11 from Solyndra.  Enforcement of Plaintiff's stop notice does not

12 clearly or manifestly conflict with the purposes or objectives of

13 the FFB Act.

14     Because FFB has not met its burden of showing that enforcing

15 California's stop-notice law in this case would impermissibly

16 hamper the purpose and objectives of either the FFB Act or the

17 Energy Policy Act, FFB's Rule 12(b)(1) motion to dismiss this

18 action on conflict preemption grounds is DENIED.

19 _____

20 [20] Additionally, materials provided by FFB suggest that Congress
   largely achieved its objective of saving taxpayer funds simply by
21 creating FFB.  See generally McNamar Report.  Before FFB, a
   multiplicity of federal agencies had engaged in loan-guarantee
22 programs, with the loans being sourced from private lending
   markets.  The influx of federal agencies had the unintended effect
23 of raising demand for private lending and hence increasing interest
   rates, at the expense of the taxpayer.  Congress created FFB in
24 part so that the federal government's left hand would know what its
   right hand was doing; hence, the emphasis in 12 U.S.C. § 2281 on
25 "coordination" between federal agencies and minimizing "disruption"
   in private lending markets.  The evidence supplied by FFB tends to
26 show that Congress largely accomplished its cost-saving objective
   simply by creating FFB.  See, e.g., id. at 14-15.  It does not tend
27 to show that Congress intended to shield FFB from any suit under
   state law which could raise costs for federal taxpayers.  One
28 wonders why, if Congress meant to do that, it did not simply
   preserve FFB's sovereign immunity.

**United States District Court**
For the Northern District of California

1    **3.   California's Definition of "Construction Lender"**

2    FFB requests that if the Court denies its Rule 12(b)(1)

3    motion, the Court treat the motion as one for summary judgment and

4    enter judgment in its favor on the ground that FFB is not a

5    construction lender under California law.   However, as discussed

6    above, FFB was such a construction lender with respect to the

7    Solyndra project.   Therefore, to the extent that FFB's motion is

8    one for summary judgment, that motion is DENIED.

9

10   **IV.   <u>CONCLUSION</u>**

11   For the foregoing reasons, the Court DENIES Plaintiff Kinetic

12   Systems, Inc.'s motion to remand this action to California state

13   court.   Defendant Federal Financing Bank is hereby ORDERED to

14   comply with 28 U.S.C. § 1446 by submitting an amended notice of

15   removal within seven (7) days of the signature date of this Order

16   and consistent with the guidance herein.

17   Additionally, the Court DENIES Defendant Federal Financing

18   Bank's motion to dismiss this action on sovereign-immunity and

19   conflict-preemption grounds.   To the extent that Defendant's motion

20   is construed as one seeking summary judgment on the ground that

21   Defendant is not a "construction lender" under California law, that

22   motion, too, is DENIED.

23   The parties may now commence court-sponsored mediation

24   pursuant to the Court's August 15, 2012 approval of their

25   stipulation to do so.   ECF No. 36 ("ADR Order").   The ADR Order set

26   a deadline for completing mediation: ninety (90) days after

27   resolution of the pending motions to remand and dismiss.   Those

28   motions now being resolved, the mediation deadline is set.   The

1  parties shall complete court-sponsored mediation within ninety (90)

2  days of the signature date of this Order.

3       Following mediation, both parties shall appear for a case

4  management conference at 10:00 a.m. on Friday, January 11, 2013, in

5  Courtroom One, United States Courthouse, 450 Golden Gate Avenue,

6  San Francisco, California.

7

8       IT IS SO ORDERED.

9

10      Dated: September 14, 2012     

11                                    UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California