**United States District Court**
For the Northern District of California

1

2

3

4

5

6               IN THE UNITED STATES DISTRICT COURT

7            FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9  KINETIC SYSTEMS, INC.,            ) Case No. 12-cv-01619-SC
                                     )
10          Plaintiff,               ) ORDER ON CROSS MOTIONS FOR
                                     ) SUMMARY JUDGMENT
11      v.                           )
                                     )
12                                   )
   FEDERAL FINANCING BANK,           )
13                                   )
            Defendant.               )
14                                   )
                                     )
15                                   )
                                     )
16                                   )
                                     )
17 _____ )

18

19  **I.  INTRODUCTION**

20       In September of 2009, the U.S. Department of Energy ("DOE")

21  and Defendant Federal Financing Bank ("FFB") entered into a series

22  of agreements with Solyndra FAB 2, LLC ("FAB 2").  FAB 2 was wholly

23  owned by Solyndra, Inc. ("Solyndra"), a now-defunct solar panel

24  technology company.  FFB purchased a promissory note from FAB 2 in

25  the amount of $535 million, and DOE guaranteed the note.  Plaintiff

26  Kinetic Systems, Inc. ("Kinetics") is a California contractor.  It

27  was hired to perform work on a Solyndra factory in Fremont,

28  California.  Kinetics alleges that it performed work worth

$2,870,372.  Solyndra declared bankruptcy and abruptly ceased operations in August of 2011, and Kinetics claims that it was owed $1,187,950 when Solyndra closed.  Kinetics brings this action alleging that FFB holds excess construction funds, and that Kinetics has a right to be paid from those funds.  Now before the Court are the parties' cross motions for summary judgment.  Both motions are fully briefed,[1] and the Court finds them suitable for disposition without oral argument pursuant to Civil Local Rule 7-1(b).  For the reasons set forth below, Defendant FFB's motion for summary judgment is GRANTED and Plaintiff Kinetics' motion for summary judgment is DENIED.

## II. **BACKGROUND**

These motions are heavily dependent on the context of this case.  That background includes the nature of FFB and the specific details of FFB's agreements with DOE and FAB 2.  The Court laid out these important facts in its order on Kinetics' motion to remand and FFB's motion to dismiss.  See Kinetic Sys., Inc. v. Fed. Fin. Bank, 895 F. Supp. 2d 983 (N.D. Cal. 2012).  Because those same facts are critical to these motions as well, the Court reiterates them -- with minor variations and updates -- here.

### A. **FFB**

Nearly forty years ago, Congress created FFB by passing the Federal Financing Bank Act of 1973, Pub. L. No. 93-224, 87 Stat. 937 (1973) ("FFB Act"), codified at 12 U.S.C. § 2281 et seq.

---

[1] ECF Nos. 50 ("FFB Mot."); 61 ("Kinetics Opp'n"); 66 ("FFB Reply"); 55 ("Kinetics Mot."); 63 ("FFB Opp'n"); 68 ("Kinetics Reply").

United States District Court
For the Northern District of California

Congress found that "demands for funds through Federal and federally assisted borrowing programs [were] increasing faster than the total supply of credit and that such borrowings [were] not adequately coordinated with overall Federal fiscal and debt management policies."  12 U.S.C. § 2281.  Federal agencies administering increasingly popular loan-guarantee programs were using private lenders to furnish the loans, which had the unintended effect of increasing costs to the federal government and disrupting private finance markets.  The purpose of the FFB Act was "to assure coordination of these programs with the overall economic and fiscal policies of the Government, to reduce the cost of Federal and federally assisted borrowings from the public, and to assure that such borrowings are financed in a manner least disruptive of private financial markets and institutions."  12 U.S.C. § 2281.[2]  Congress established FFB as a "body corporate . . . subject to the general supervision and direction of the Secretary of the Treasury" and made it "an instrumentality of the United States Government."  Id. § 2283.

Congress conferred on FFB a number of general powers.  Id. § 2289.  One of these is the power "to sue and be sued, complain, and defend, in its corporate name."  Id. § 2289(1).  Another is the power "to enter into contracts, to execute instruments to incur liabilities, and to do all things as are necessary or incidental to the proper management of its affairs and the proper conduct of its

---

[2] See also Pealo v. Farmers Home Admin., 412 F. Supp. 561, 563 (D.D.C. 1976), rev'd 562 F.2d 744 (D.C. Cir. 1977) (Congress established FFB "to provide a source of funds for Federal agencies so as to lessen competition among the agencies in the private money market and to provide lower interest cost to the United States.").

business." Id. § 2289(9).  One of the functions of FFB is to purchase or sell any obligation issued, sold, or guaranteed by a federal agency.  Id. § 2285(a).  "Obligation" is a defined term that includes "any note, bond, debenture, or other evidence of indebtedness," with certain exceptions not relevant here.  Id. § 2282(2).  FFB often exercises its power to purchase obligations in order to serve as a lender for programs wherein a federal agency (for example, DOE) guarantees a loan to a private entity (for example, a builder of electrical infrastructure).  Generally, FFB provides the financing by purchasing a note which the federal agency then guarantees.

**B.    The Solyndra Financing Arrangement**

The Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005) ("Energy Policy Act"), codified at 42 U.S.C. § 16511 et seq., authorizes the Secretary of Energy ("Secretary") to guarantee loans for certain eligible projects, and appropriates funds to cover the costs of such guarantees.  See 42 U.S.C. §§ 16511-14. When the Secretary guarantees 100 percent of a loan, the loan must be funded by FFB (as opposed to a private bank).  See 10 C.F.R. § 609.10(d)(4)(i).

In September 2009, FFB and the Secretary entered into a Program Financing Agreement that supplies the general framework for this financing program.  See ECF No. 7 ("Willis-Proctor Decl.") Ex. 1 ("PFA").  The financing process begins when the Secretary designates a borrower.  See id. § 2.1.  The Secretary's formal designation of a borrower places the Secretary and FFB under three separate commitments: (a) FFB and the Secretary must sign "a Note Purchase Agreement with the particular Borrower . . . setting forth

United States District Court
For the Northern District of California

the terms and conditions under which FFB will purchase a Note issued by such Borrower"; (b) the Secretary must guarantee the note pursuant to the Energy Policy Act; and (c) FFB must purchase the note pursuant to the FFB Act.  Id. § 2.3.  Note Purchase Agreements signed by FFB and designated borrowers require the borrower to offer a promissory note to FFB, which FFB then buys, assuming certain preconditions are satisfied.  Id. §§ 1.1, 4.1.  One of those preconditions is the receipt by FFB of the Secretary's guarantee of the note in the event that a borrower defaults.

The PFA provides that the note shall be a future advance promissory note.  Id. § 1.1 (definition of "Note").  The amount of the note represents the maximum amount of financing that a borrower may receive under their particular PFA.  Form NPA § 7.3.4.[3]  The borrower receives the financing by requesting an advance on the note.  Id. § 7.2.  The borrower usually must specify a third party to receive the advance; in other words, FFB gives money to the borrower's creditors, not to the borrower itself.  Id. § 7.2(b).[4] The Secretary must approve each request before FFB will disburse the advanced funds.  Id. § 7.2(a).  Advances may be made "only at such time and in such amount as shall be necessary to meet the immediate payment or disbursing need of the Borrower."  Id.

On September 2, 2009, FAB 2, DOE, and FFB entered into a Note Purchase Agreement.  Willis-Proctor Decl. Ex. 2 ("Solyndra NPA").

---

[3] The Willis-Proctor Declaration has several exhibits, the first of which is the PFA; the PFA, in turn, has several Annexes consisting of form examples of documents required by the PFA.  Annex 3 to the PFA is a form Note Purchase Agreement ("Form NPA").

[4] The PFA makes an exception for "[a]dvances to reimburse the Borrower for expenditures that it has made from its own working capital."  Form NPA § 7.2(b).

United States District Court
For the Northern District of California

Under the terms of the Solyndra NPA, FAB 2 agreed to offer FFB a
note in the amount of $535 million.  The Secretary guaranteed the
note and FFB purchased it.  The terms of the Solyndra NPA tracked
the general terms set forth above.  That is, the Secretary
guaranteed a $535 million note offered by FAB 2 and purchased by
FFB, against which note FAB 2 could request advances of funds
which, if approved by the Secretary, FFB would pay directly to FAB
2's creditors according to its "immediate payment or disbursing
needs[s]," up to an aggregate maximum of $535 million and repayable
with interest.

### C.   Kinetics' Stop Notice

Kinetics contracted with Solyndra to perform work on a
Solyndra factory in Fremont (known as "Building 4," the "Front-End
Project Facility," or the "Front-End Site").  Kinetics' job was to
install tools in the Front-End Site.  Kinetics contracted to
perform work worth $2,967,762, and had completed work worth
$2,870,372 when Solyndra ceased operations.  ECF No. 56 ("Mesnickow
Decl.") ¶ 14.  Kinetics claims it has been paid $1,682,422, leaving
a balance due of $1,187,950, plus interest.  Id. ¶ 15.  On January
23, 2012, about five months after Solyndra closed, Kinetics served
a bonded stop notice upon FFB.  ECF No. 1 ("Removal Not.").  A stop
notice is "a notice by one who has furnished materials or labor for
the construction of improvements, given to the owner of the
property, or to a lender of funds to be used for payment of claims
against such property, for the purpose of withholding money in the
hands of such owner or lender from the contractor so that the
materialman or laborer may be paid for his material or services."
See Flintkote Co. v. Presley of N. Cal., 154 Cal. App. 3d 458, 462

(Cal. Ct. App. 1984) (citing <u>Theisen v. Cnty. of Los Angeles</u>, 54 Cal. 2d 170, 177-179 (Cal. 1960)); <u>see also</u> Miller & Starr, 10 <u>Cal. Real Est.</u> § 28:78 (3d ed.).  A bonded stop notice is a stop notice supported by a bond of 125 percent of the amount of the claim contained in the stop notice.

### D.   Procedural History

Kinetics initially brought this action in California Superior Court in Alameda County.  FFB removed to federal court.  In September of 2012, the Court denied Kinetics' motion to remand, FFB's motion to dismiss, and FFB's alternative motion for summary judgment.  ECF No. 41.  FFB filed another motion for summary judgment on September 5, 2013, and Kinetics filed its cross-motion the next day.  Both motions were fully briefed by the end of September 2013.  The Court took the matter under submission and informed the parties that the motions would be decided without oral argument.  On October 8, 2013, however, the Court granted FFB's <u>ex parte</u> motion to stay the case during the federal government shutdown.  ECF No. 75.  The shutdown ended on October 17, but neither party took any action in this case over the next several months.  On June 26, the Court directed the parties to file a joint statement regarding the status of the case.  The parties did so on July 2, requesting that the Court lift the stay and rule on the pending motions for summary judgment.  ECF No. 78.  The Court hereby LIFTS the stay and proceeds to rule on the pending motions.

### III.  LEGAL STANDARD

Entry of summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment should be granted if the evidence would require a directed verdict for the moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986).  "A moving party without the ultimate burden of persuasion at trial -- usually, but not always, a defendant -- has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment."  Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).

"In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  Id.  "In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact."  Id.  "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  Id. at 252.

**IV.  DISCUSSION**

California's stop notice law entitles contractors, subcontractors, and other persons identified by statute to serve a stop notice upon a construction lender.  If properly served, the construction lender is required to withhold funds from the

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

unexpended balance of the loan sufficient to pay the contractor who served the stop notice.  The lender may disregard an unbonded stop notice, but failure to withhold funds after service of a bonded stop notice may render the lender personally liable to the claimant.  See Connolly Dev., Inc. v. Superior Ct., 17 Cal. 3d 803, 809 (Cal. 1976).  The facts of this case are mostly undisputed. However, the parties disagree as to whether and how the stop notice law applies.

### A.   Written Preliminary Notice

A claimant serving a construction lender with a stop notice is usually required to provide written notice to the owner, original contractor, and lender around the time he begins work.  This notice must provide certain information about the claimant and the work he will perform.  Notice must be given "not later than 20 days after the claimant has first furnished labor, service, equipment, or materials to the jobsite." Cal. Civ. Code § 3097(d).  Failure to provide notice within the required 20 day time period limits the claimant to a stop notice only for work performed within 20 days prior to service of the notice.  Id. § 3097(a)-(d), repealed by Stats. 2010, c. 697 (S.B. 189) § 16, operative July 1, 2012)).[5]  If

---

[5] Certain revisions to California's stop-notice laws became operative on July 1, 2012, after the events giving rise to this case had completed.  Therefore, the parties agree that the old Section 3097 notice requirement governs this case.  The revisions mainly restyled and renumbered the applicable sections of the California Civil Code.  See 44 Cal. Jur. 3d § 69 (section on mechanics' liens and stop notices setting forth definitions which apply under either pre- or post-revision code).  However, the revisions substantively changed the 20-day notice requirement by eliminating the exception for "the contractor."  Under the current law, then, Kinetics would indisputably have been required to provide a 20-day notice to FFB.  One California court has interpreted the amendment to support the conclusion that Section 3907(b) exceptions only one prime or general contractor from the

1  the claimant serves a stop notice upon the lender more than 20 days

2  after work has stopped, therefore, he is not entitled to a stop

3  notice at all.  See Romak Iron Works v. Prudential Ins. Co., 104

4  Cal. App. 3d 767, 778 (Cal. Ct. App. 1980) (claimant's notice did

5  not reach any work performed earlier than the 20 days preceding

6  service).

7       Two notice provisions are at issue here.  Section 3907(a)

8  requires that notice be provided to the owner, original contractor,

9  and construction lender.  It exempts "one under direct contract

10 with the owner."  Cal Civ. Code § 3907(a).  Section 3907(b)

11 requires that notice be provided only to the construction lender,

12 and it exempts "the contractor."  Id. § 3907(b).

13      Because FFB was the construction lender, both subsections

14 apply.  If Kinetics was not exempt from both sections, then it was

15 required to serve a 20-day notice on FFB.  It is undisputed that

16 Kinetics' work on the Solyndra facility stopped at the end of

17 August 2011.  FFB Mot. at 8; Kinetics Mot. at 5; Mesnickow Decl. ¶¶

18 17-18.  It is also undisputed that Kinetics never provided a 20-day

19 notice and that Kinetics did not serve its bonded stop notice until

20 either January 23 or 24, 2012.  FFB Mot. at 8; Kinetics Mot. at 9;

21 Removal Not.  Kinetics, however, argues that it is exempt from

22 subsection (a) because it was under direct contract with the owner,

23 and from subsection (b) because it was "the contractor."

24           **1.  Direct Contract with the Owner**

25      Kinetics' contract was with Solyndra, but FAB 2 was to own the

---

26 notice requirement.  See Brewer Corp. v. Point Ctr. Fin., Inc., 223

27 Cal. App. 4th 831, 850 (Cal. Ct. App. 2014).  The new version of
   the 20-day notice requirement is codified at California Civil Code

28 Section 8200.

Front-End Site.  FFB argues that, therefore, Kinetics was not under direct contract with the owner and not exempt from the notice requirement.  Kinetics responds that Solyndra and FAB 2 were substantial equivalents, and that Solyndra should be considered an owner.  The Court need not resolve this issue.  As described below, the Court finds that Kinetics was never "the contractor" under Section 3907(b), and was accordingly required to serve a 20-day notice upon FFB.

### 2.   "The Contractor"

California courts have made clear that the exemption for "the contractor" in subsection (b) applies only to "the prime or general contractor for the project, not multiple contractors, i.e., the subcontractors or others with direct contracts with the owner." Shady Tree Farms v. Omni Fin., 206 Cal. App. 4th 131, 138 (Cal. Ct. App. 2012).  The parties agree that Rudolph and Sletten was the original general contractor for the construction of the Front-End Site.  However, Kinetics points to Westfour Corporation v. California First Bank, in which one contractor (Westfour) signed on to complete a building's interior after two years of exterior renovation.  The trial court in Westfour found that Westfour "had replaced [the contractor that worked on the exterior] as general contractor" and should be considered "the contractor" for the purposes of subsection (b).  3 Cal. App. 4th 1554, 1561-62 (Cal. Ct. App. 1992).

The California Court of Appeals agreed that the evidence supported the trial court's finding.  Facts sufficient to support the finding that Westfour was "the contractor" included: (1) the construction contract referred to Westfour as "the contractor;" (2)

11

United States District Court
For the Northern District of California

1   the construction contract specifically contemplated that Westfour
2   might hire subcontractors; and (3) Westfour always acted as a
3   general contractor and not a subcontractor.  Id. at 1562.
4   Additionally, the contractor that preceded Westfour executed a
5   certificate of substantial completion several months before
6   Westfour contracted with the owner.  Id. at 1557.

7        Both the text of Section 3907(b) and the cases interpreting it
8   make clear that only one contractor can be considered "the
9   contractor" at any given time.  The Westfour court found that one
10  contractor had succeeded another as "the contractor" on separate
11  projects, not that multiple contractors could be considered "the
12  contractor" simultaneously.  Thus Westfour does not disturb the
13  holding from Shady Tree that "the contractor" is the prime or
14  general contractor.  The Court proceeds to determine whether
15  Kinetics succeeded Rudolph and Sletten as "the contractor" on the
16  Front-End Site.

17       Solyndra contracted with Kinetics pursuant to an Equipment
18  Supply Agreement ("ESA") between Solyndra and FAB 2.  ECF No. 52
19  ("Nwachuku Decl.") Ex. 2 ("ESA").  The ESA required Solyndra to
20  provide FAB 2 with system integration (including hardware,
21  software, automation, support systems, and seismic attachment
22  systems); supplier management; interfaces and interoperability
23  between the equipment supplied and the manufacturing execution
24  system and factory information system; tool installation;
25  permitting; regulatory compliance; and equipment support planning.
26  Id. at FFB001815-FFB001816.  The progress report submitted to DOE
27  at the end of October also described other interior work, including
28  "lobby stone tile, carpet, light fixtures, and finish paint."  ECF

United States District Court
For the Northern District of California

No. 65 ("Saltiel Decl. II") Ex. 3 ("Progress Rpt. 13") at
FFB001596.

    The tool installation section of the ESA provides that "[a]ll
Tools will be installed with correct connections to Facility
systems for . . . specialty gases, natural gas, . . . water and
chemical drains, heat exhaust, acid exhaust, particle exhaust, and
any other requirements." ESA at FFB001816. Solyndra hired
Kinetics only to "[c]onnect [Solyndra's] tools to the pipes that
were installed during the base build." ECF No. 53 ("Saltiel Decl.
I") Ex. 1 ("Conner Depo. Pt. 1") at 35:25-36:1. Those pipes were
for "[c]hem, gas, waste, water, process exhaust." Id. at 36:3-4.
Thus Kinetics' work on the project was limited to the tool
installation component of the ESA. The financial aspects of the
ESA also reflect Kinetics' limited role: the contract price for the
entire ESA was $318,852,553, but Kinetics' contract was worth only
$2,967,762 -- less than one percent of the total value of the ESA.
See Progress Rpt. 13 at FFB001595; Mesnickow Decl. ¶ 14. These
facts indicate that it would strain common sense to consider
Kinetics "the contractor" on the project.

    When Kinetics began work on the tool installation, a number of
other contractors, including Rudolph and Sletten, CH2M Hill, and
ACCO, were also present on the project site. See Saltiel Decl. II
Ex. 1 ("Conner Depo. Pt. 2") at 37:10-38:20. The parties agree
that Rudolph and Sletten was the general contractor, at least for
the purposes of work on the exterior of the factory. See FFB Mot.
at 5; Nwachuku Decl. ¶ 4; Kinetics Mot. at 1, 3. Kinetics
nonetheless argues that, as in Westfour, Rudolph and Sletten was
"the contractor" for construction of the exterior, while Kinetics

was "the contractor" for the factory's interior improvements.
Kinetics Mot. at 3.  However, the differences from Westfour are
numerous and significant.

In Westfour, the contractor responsible for the exterior of
the building finished work and executed a certificate of
substantial completion several months prior to Westfour even
contracting with the owner.  Here, the original contractor was
still on site when Kinetics started work, meaning that Kinetics
could not have possibly succeeded Rudolph and Sletten as the only
prime or general contractor.  Indeed, Kinetics submitted its bid to
Solyndra in May 2010 and began work in mid-2010.[6]  Mesnickow Decl.
¶¶ 8-9.  But Kinetics admits that the exterior work -- for which
Rudolph and Sletten was the general contractor -- was not completed
until December 2010, about six months after Kinetics began work.
See Kinetics Reply at 5; ECF No. 69 ("Troughton Decl. I") Ex. B
("Finger Depo. I") at 109:20-112:12.  Unlike Westfour, Kinetics was
on-site while the original contractor was also present and
completing its work.  That fact makes it more difficult to separate
the work done on the Front-End Site into two distinct projects, as
the Westfour court did.  Though the timing issue is not necessarily
dispositive -- presumably two different projects with two different
prime contractors could occur simultaneously -- it certainly makes
Kinetics' argument less credible.  Because Kinetics provides no
evidence that its portion of the work on the interior was a
separate project from the rest of the Front-End Site construction

---

[6] The exact date is unclear, but Solyndra apparently issued a
purchase order to Kinetics on June 14, 2010.  Mesnickow Decl. Ex. C
at KNTS0000318.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

(and interior work <u>not</u> assigned to Kinetics), the Court declines to follow <u>Westfour</u> in this case.

Additionally, R.W. Beck (an engineering firm that DOE hired to oversee construction) submitted a progress report to DOE in October 2010.  The progress report mentions several contractors and subcontractors working on the Front-End Site: Rudolph and Sletten (described as "the general contractor"), CH2M Hill (responsible for "overall management of the engineering and design effort"), Studios Architecture (architectural consultant), Degenkolb Engineers (structural engineer), Kier & Wright (civil engineer and surveyor), and The Guzzardo Partnership (landscape architect).  Progress Rpt. 13 at FFB001596.  Kinetics is not mentioned once in the entire report, even though the report discusses interior work and tool connections in some detail.  The inescapable conclusion is that Kinetics simply did not play a very large role relative to the size of the entire project.  By contrast, in <u>Westfour</u>, the contract between Westfour and the owner described Westfour as the contractor for the entirety of the building interior and envisioned Westfour hiring subcontractors.  Here, Solyndra hired Kinetics to complete only a small, discrete portion of the work that Solyndra had promised to FAB 2, and several other contractors were also working on the factory simultaneously.  Given these circumstances, it is impossible to conclude that Kinetics was the prime or general contractor.

Kinetics makes two additional counterarguments.  First, Kinetics argues that the language of the contract suggests that Kinetics was "the contractor."  Kinetics argues that the contract refers to Kinetics as "The Contractor."  Kinetics Opp'n at 10.  But

United States District Court
For the Northern District of California

Kinetics supplies only purchase orders, not the contract, to support that claim.[7]  See id.; Mesnickow Decl. Ex. C at KNTS0000003, KNTS0000116.  It is not at all clear from the purchase orders that the designation "The Contractor" was meant to identify Kinetics as the prime contractor on the project.  Indeed, the terms and conditions attached to the purchase orders refer to Kinetics as "Supplier."  Mesnickow Decl. Ex. C at KNTS0000005, KNTS0000118.  There is no indication whatsoever that the terms "contractor" and "supplier" were used to indicate that Kinetics was the prime contractor, rather than simply as a shorthand way to distinguish Kinetics from the other party to the purchase orders (Solyndra).

Finally, Kinetics argues that it is a licensed general contractor, and therefore should be considered "the contractor." Kinetics Opp'n at 10.  However, Kinetics' general contractor's license does not automatically make Kinetics "the contractor" for every project.  Indeed, Kinetics did additional work on the Solyndra factory that is not at issue in this lawsuit.  Kinetics did that work as a subcontractor to Rudolph and Sletten.  See Kinetics Opp'n at 5; Conner Depo. Pt. 1 at 27:15-30:24.  Therefore, unlike Westfour, Kinetics undoubtedly did not always work as a general contractor and not as a subcontractor.

For these reasons, the Court finds that Kinetics was never "the contractor" for the purposes of California Civil Code Section 3907(b).  There is substantial evidence -- in fact, it is undisputed -- that Rudolph and Sletten was "the contractor" for the

---

[7] Kinetics argues that the contract with Solyndra was "memorialized by a Kinetics' proposal and series of several purchase orders." Kinetics Mot. at 10.

purposes of Section 3907(b) until at least December 2010.  Kinetics
has failed to produce evidence sufficient to show that Kinetics
became "the contractor" on the project at any subsequent point.
Therefore, Kinetics was required to provide a 20-day notice to FFB.
Because it is undisputed that Kinetics did not do so, Kinetics'
stop notice did not comply with the statute.

### 3.  **Actual Notice**

Kinetics makes an additional argument that that a 20-day
notice should not be required because FFB had actual notice that
Kinetics was working on the Front-End Site and because FFB suffered
no prejudice due to lack of notice.  Kinetics Opp'n at 15-16.
There is no actual notice exception in the statute, which requires
"written preliminary notice" as a "necessary prerequisite to the
validity of . . . a notice to withhold."  Cal. Civ. Code § 3907(a)-
(b).  However, Kinetics cites two California cases as creating an
actual notice exception.

The first such case is Industrial Asphalt v. Garrett
Corporation.  180 Cal. App. 3d 1001 (Cal. Ct. App. 1986).  Garrett
Corporation ("Garrett") leased real property and hired a contractor
to improve it.  The contractor in turn hired Industrial Asphalt
("Industrial") as a subcontractor.  Industrial provided a
preliminary 20-day notice to Garrett (considered the "owner" under
Section 3907(a)) but not to the general contractor.  Id. at 1004.
The contractor filed for bankruptcy and failed to pay Industrial.
Industrial recorded a mechanic's lien and brought suit against
Garrett to foreclose on the lien.  The trial court held that
Section 3907(a) required Industrial to provide written notice to
both the contractor and the owner.  Thus, even though Industrial

did provide notice to the owner, its failure to notify the
contractor defeated its claim.

The California Court of Appeal reversed.  It noted that the
"strict statutory construction would allow a party who received the
required notice to be insulated from liability because another
party did not receive notice."  Id. at 1006.  Refusing to accept
"this aridly formalistic result," the Court of Appeals held that
Industrial's notice to Garrett satisfied the 3907(a) notice
requirement.  Id.

To the extent that Kinetics claims Industrial Asphalt created
an actual notice exception to Section 3907(a), Kinetics misreads
that case.  The defendant in Industrial Asphalt received a valid
and timely written notice from the subcontractor.  It was a third
party who did not receive the required written notice.  The
subcontractor was technically required by statute to serve the
third party, but its failure to do so had no effect at all on the
defendant.  Were that the situation here -- that is, had Kinetics
served a valid 20-day notice on FFB but not on Rudolph and Sletten
-- this would be a very different case.  But that is not what
happened.  Here, Kinetics failed to serve the defendant.
Industrial Asphalt is inapposite.

The second case Kinetics cites is Truestone, Inc. v. Simi West
Industrial Park II.  163 Cal. App. 3d 715 (Cal. Ct. App. 1984).  In
Truestone, the plaintiff alleged that the owner expressly promised
to pay for deliveries of materials.  Id. at 723.  Though the
plaintiff was technically a subcontractor, the court held that
there were triable issues of fact as to whether the plaintiff was
exempted from the notice requirement as one under direct contract

United States District Court
For the Northern District of California

with the owner.  Kinetics cites language from Truestone to the effect that "an exception to the statutory notice requirement precludes the defeat of the lien on meaningless technicalities where a materialman is known to the property owner and makes deliveries in reliance on his promise to pay."  See Kinetics Opp'n at 15-16 (citing id.).  However, the Truestone court also explicitly rejected the notion of an actual notice exception: "Because strict compliance with the statute is required, a claim of actual notice or substantial compliance is irrelevant."  Truestone, 63 Cal. App. 3d at 721.  The best reading of Truestone, therefore, is that Truestone counsels a broad definition of the direct contract with owner exception.  Because the owner in Truestone expressly promised to pay the subcontractor, the subcontractor could be considered under direct contract with the owner and therefore exempt under Section 3907(a).

It is also telling that both Industrial Asphalt and Truestone deal only with Section 3907(a) and owners, rather than lenders. Lenders are a step further removed from the construction process than owners, and thus less likely to have dealings directly with potential lienholders.  Neither case created an actual notice exception to Section 3907(a) or (b); indeed, Truestone explicitly states that no such exception exists.  Industrial Asphalt held that notice to the defendant alone may be sufficient, even if notice to others is technically required, so long as it did not prejudice the defendant, failure to notice a third party does not defeat a contractor's claim.  Truestone held that an owner who expressly promises to pay a subcontractor is sufficiently under direct contract with the subcontractor that the exemption in Section

19

**United States District Court**
For the Northern District of California

1    3907(a) applies.  Neither case has a bearing on the situation here.

2        Even were the Court, contrary to California law, to apply an

3    actual notice exception, Kinetics has failed to produce evidence

4    that FFB had sufficient actual notice.  In support of its assertion

5    that FFB had actual notice, Kinetics cites the deposition of

6    Frederich Finger, an engineer for R.W. Beck.  R.W. Beck was the

7    Lender's Engineer -- the engineer that DOE hired to oversee the

8    Solyndra construction projects.  Kinetics argues that FFB

9    designated DOE as its compliance agent, and that any knowledge that

10   DOE or DOE's Lender's Engineer had should be imputed to FFB.

11   Kinetics Opp'n at 16.  Kinetics points to Mr. Finger's testimony

12   that (1) he reviewed contract pay applications, (2) he reviewed

13   Solyndra's monthly draw requests on the loan, and (3) he saw a

14   contractor doing tool connection work at the Front-End Site.  See

15   id. at 17 (citing ECF No. 62 ("Troughton Decl. II") Ex. A ("Finger

16   Depo. II") at 24, 34, 74).  None of those facts indicate that Mr.

17   Finger had actual knowledge that Solyndra had contracted with

18   Kinetics.  Indeed, Mr. Finger explicitly disclaimed any knowledge

19   that Kinetics was working on the project.  Finger Depo. II at

20   73:12-16.  Nor does Kinetics present any evidence that Mr. Finger

21   ever communicated any information regarding Kinetics to DOE or FFB.

22       **B.   Other Issues**

23       The notice issue is dispositive.  Because Kinetics failed to

24   provide notice to FFB within 20 days of beginning work, the stop

25   notice Kinetics served upon FFB is invalid.  Though the parties

26   raise a number of other issues in their motions, the Court need not

27   reach them.

28

**United States District Court**
For the Northern District of California

1    **V.   <u>CONCLUSION</u>**

2         The Court finds that Kinetics was required to provide notice

3    to FFB under California Civil Code Section 3907(b) because Kinetics

4    was not "the contractor" for the Front-End Site construction

5    project.  Kinetics did not provide the required notice, and its

6    stop notice is therefore invalid.  Accordingly, the Court GRANTS

7    Defendant Federal Financing Bank's motion for summary judgment and

8    DENIES Plaintiff Kinetic Systems, Inc.'s motion for summary

9    judgment.

10

11        IT IS SO ORDERED.

12

13        Dated: August 11, 2014                  _____

14                                           UNITED STATES DISTRICT JUDGE